Jon F. Monroy, SBN 51175
Jennifer E. Gysler, SBN 143449
MONROY, AVERBUCK & GYSLER
32123 Lindero Canyon Road, Ste 301
Westlake Village, CA 91361
(818) 889-0661 Fax (818) 889-0667

Attorneys for Defendants,
DEPUTY UPCHURCH, DEPUTY ZUNIGA,
LT. MOSQUERA, SHERIFF JIM McDONNELL
(erroneously sued as Chief J. McDonnel),
DEPUTY F. ABRIL, DEPUTY J. SANFORD,
DEPUTY M. TRIMBLE II, NURSE F. MOSCOSO;
LT. A. SALINAS, SGT. GASATAYA, SGT. R.
GARCIA, SGT. J. MORALES,
SGT. ROBERT THOMPSON (erroneously sued as
"Sgt. Toms"); DEPUTY M. ENRIQUEZ, JR.,
DEPUTY J. GARIBAY, DEPUTY D. HAAS,
DEPUTY A. INES, DEPUTY J. LEW,
DEPUTY RODRIGUEZ, DR. N. TEOPHILOV,
DR. B. FELAHY, DR. S. LITTLE, DR. A. PRYOR,
DR. Y. SILVANSKAYA, DR. K. VIVO,
DR. P. ZOLNOUNI, NURSE J. ANDERSON,
NURSE O. LUNA, NURSE B. MENEFEE,
NURSE C. TUTT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ROBERT VOSKANYAN, | ) Case No.: CV 15-6259 MWF (KES) |
| Plaintiffs, | ) STATEMENT OF |
| | ) UNCONTROVERTED FACTS AND |
| vs. | ) CONCLUSIONS OF LAW IN |
| | ) SUPPORT OF MOTION FOR |
| L.A. SHERIFFS et al. | ) SUMMARY JUDGMENT |
| Defendants | ) DATE: June 2, 2020 |
| | ) TIME: 10:00am |
| | ) DEPT: Courtroom 6D |

TO PLAINTIFF IN PRO PER:

County Defendants submit the following Statement of Uncontroverted Material Facts and Conclusions of Law in support of their Motion for Summary Judgment.

The County Defendants assert that the action has no merit and presents no triable issue of material fact with respect thereto, and that said Defendants are entitled to summary judgment as a matter of law, because defendants did not violate the plaintiff's civil rights, did not deny plaintiff medical care and provided medical which was well within the standard of care.

DATED:  April 16, 2020                    MONROY, AVERBUCK & GYSLER


_Jennifer E. Gysler_
JENNIFER E. GYSLER
JON F. MONROY
Attorneys for County Defendants

## MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' COMPLAINT FOR CIVIL RIGHTS VIOLATIONS

Plaintiffs fail to establish a Constitutional violation; defendants did not violate the plaintiff's civil rights, did not deny plaintiff medical care and provided medical which was well within the standard of care.  Further, the individual employees are entitled to qualified immunity.

### DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE

1. Plaintiff Robert Voskanyan, who was a pre-trial detainee during the time period in question, sues the following defendants in their individual capacities, who were employees of the County of Los Angeles at the time of the subject incident, former Sheriff Jim McDonnell, Lt. Hugo Mosquera, Lt. A. Salinas, Sgt. Gasataya, Sgt. R. Garcia, Sgt. Morales, Sgt. Toms (Thompson), Deputy Abril, Deputy Borja (deceased), Deputy Enriquez Jr., Deputy Garibay, Deputy Haas, Deputy

Ines, Deputy Lew, Deputy Rodriguez, Deputy Sanford, Deputy Tremble, Deputy Zuniga, Deputy Upchurch, Dr. N. Teophilov, Dr. Felahy, Dr. Little, Dr. Pryor, Dr. Silvanskaya (deceased), Dr. Vivo, Dr. Zolnouni, Nurse Anderson, Nurse Luna, Nurse Moscoso, Nurse Menefee, Nurse Tutt, arising out of an inmate assault which occurred on July 7, 2015, and subsequent medical treatment at Men's Central Jail and Twin Towers Correctional Facility, for civil rights violations (8th Amendment & 14th Amendment) [Exh. A, Fourth Amended Complaint, generally; Exh, C, Booking Records p. 3-4,19]

2.  The County Defendants filed an Answer to the Fourth Amended Complaint asserting all appropriate defenses.  [Exhibit B, Answer to Complaint / Joinder to Answer].

3.  The plaintiff, Robert Voskanyan,

was arrested for kidnapping during a carjacking on June 19, 2015 and ultimately booked into Men's Central Jail.  [Exhibit C, jail booking records, pg. 3]

4.  Mr. Voskanyan was processed at IRC (Inmate Reception Center) on June 19, 2015.  On his medical screening form, Mr. Voskanyan indicated he has high blood pressure, an open wound / abscess and takes medication.  He also indicated has a history of using drugs and/or alcohol. [Exhibit G, IRC records, p. 52]

5.  On June 23, 2015, plaintiff asked to see someone from mental health. PSW Fenender noted that plaintiff sometimes felt depressed, had a history of anxiety, but denied self harm.  [Exh I, mental health records, p. 107]

6.  Plaintiff alleges that other inmates

physically assaulted him on July 7,
2015.  He originally reported it was
four people, but later said it was 30 to
40 people.  Plaintiff alleges that two
deputies watched the assault and that
Deputies Ines, Enriquez and Sgt.
Garcia "left him to die." [Exh A,
Fourth Amended Complaint, p.14:23-
15:1-2]

7.  Plaintiff allegations are wide
ranging.  Plaintiff contends that after
he was assaulted by inmates, that the
defendant custody and medical
personnel ignored his needs and that
he suffered retaliation for
complaining. [Exh. A, Fourth
Amended Complaint, p.18-35]

8.  The inmate assault on plaintiff
occurred at the Men's Central Jail on
July 7, 2015, at the 5600 dorm in the
rear of the dorm.  Plaintiff told
deputies he saw 5-7 hispanic inmates
assaulted him. He told medical staff

he was assaulted by 4 people, told others at the jail and in his grievances that it was 30 to 40 people. [Exh E, July Incident Reports, p. 4, 12; Exh H Med Summary, p. 115]

9. Deputies Ines and Enriquez, and Sergeant Garcia, whom plaintiff contends allowed the inmate assault to occur and did not intervene, were not aware that the assault was going to occur and were not aware of the assault until afterwards. [Declarations of Deputy Ines, para.2-5; Declaration of Deputy Enriquez, para.2-4; Declaration of Sgt. Garcia, para.2,3; Exh D., PM Shift Reports July 7, 2015]

10. On July 7, 2015, after deputies and Sergeants responded to the assault, Mr. Voskanyan was taken out of the dorm and seen in the main clinic, where he was assessed by

Nurse Parsamyan and given an ice pack. She noted a small superficial abrasion and minor swelling on the bridge of his nose, and bruising under his eyes.  Nurse Parsamyan called the Medical Officer of the Day ("MOD"), Dr. Silvanskaya, who ordered the plaintiff be taken to the Urgent Care Clinic ("UCC") in the Twin Towers Correctional Facility ("TTCF") located across the street from MCJ. [Decl of Dr. Teophilov, p.2:6-18; Exh. F, Plaintiff's Jail medical record, p. 243-244]

11.  Nurse Parsamyan completed the Urgent Care Transfer Form and reported the plaintiff's clinical condition to Nurse Go in the UCC. The reason for the transfer to the UCC was a possible nasal fracture and abrasions as a result of an altercation. Nurse Parsamyan recorded in her note that Deputy Wang escorted plaintiff to the UCC on July 7, 2015 at 20:12

hours. [Decl. of Dr. Teophilov, p.2:18-23; Exh. F plaintiff's jail medical record, p. 243-244].

12. On July 7, 2015 at 1958 hours, x-rays of the plaintiff's facial bones were taken.  The radiologist, Dr. Chang, did not find an acute bony abnormality. Dr. Chang opined that there was an old minimally displaced nasal bone fracture.  [Decl. of Teophilov, p.3:1-4; Exh. G, Med Summary, p. 50]

13. On July 7, 2015 at 20:30 hours, Nurse Go recorded in the medical record that she evaluated the plaintiff in the UCC.  He reported he had been in a fight earlier in which four inmates assaulted him.  He stated his pain was 10/10, i.e. the most severe level of pain, and it was generalized over his entire body.  He did not exhibit facial

grimacing and he did not guard the movement of his facial muscles. These observations indicate that there was a discrepancy between the plaintiff's report of experiencing the most severe level of pain, i.e. 10/10, and the objective manifestations of someone who is in severe pain.  Nurse Go provided the plaintiff with a cold pack, cleansed his face, and checked his neurological status, i.e. performed a neuro check, which was unremarkable.  She did not observe active bleeding at that time.   She notified Physician Assistant ("PA") Vivo, a provider in the UCC, of the plaintiff's condition and her findings. [Decl. of Dr. Teophilov, p. 3:5-20; Exh. F Plaintiff's Jail Medical record, p. 242]

14. On July 7, 2015 at 2042 hours, PA

Vivo recorded in the medical record

that he evaluated the plaintiff who

reported that four inmates assaulted

him and hit him in the face several

times.  The plaintiff's neurological

examination was unremarkable.

There was some swelling over the

nasal area, an abrasion on his nose and

bruising under his eyes.  Nurse Go's

note documents that PA Vivo

attempted to reduce the plaintiff's

nasal fracture twice but that the

plaintiff kept moving during the

procedure.  At the conclusion of the

plaintiff's UCC evaluation, PA Vivo

ordered neuro checks to be performed

every four hours for two days. [Decl.

of Dr. Teophilov, p.3:21-6; Exh. F

Plaintiff's jail medical record, p.240, 241]

15. On July 7, 2015 at 23:11 hours, the MOD, PA Anabo, prescribed a pain medication or the plaintiff.  The prescribed pain medication was Norco, one tablet as needed for pain, twice daily, for two days.  [Decl of Dr. Teophilov, p. 4:7-10; Exh. F Plaintiff's jail medical record, p. 238]

16. On July 8, 2015 at 0014 hours, Nurse Wacera recorded in the medical record that he evaluated the plaintiff for complaints of pain in his chest with breathing, rib pain, lower back pain, and pain in his testicles.  The plaintiff felt his nose was congested. He said he had been assaulted "by like

40 people."  The plaintiff thought one

of his front teeth had been broken.  An

EKG was done. [Decl. of Dr.

Teophilov, p. 4:11-18; Exh. F

plaintiff's jail medical record, p. 237,

238]


17. On July 8, 2015 at 0245 hours, the

MOD, Dr. Kyazze, recorded in the

medical record that a nurse had called

him regarding the plaintiff's

complaints.  Dr. Kyazze reviewed the

documentation in the medical record

and the EKG.  The EKG was normal.

At 0323 hours, Dr. Kyazze ordered the

STAT administration of a medication

belonging to the groups of muscle

relaxants, Robaxin, 500 mg, by

mouth.  This medication helps

decrease the level of pain caused by

sore muscles.  Dr. Kyazze also ordered x-rays of the plaintiff's chest and ribs.  The plaintiff received the prescribed medication and was lying on a gurney without exhibiting signs of cardiac or respiratory distress.  Nurse Wacera's plan was to continue to monitor the plaintiff's health condition.  [Decl. of Dr. Teophilov, p.4:19-5:6;  Exh. F Plaintiff's Jail medical record, p.236]

18. On July 8, 2015 at 15:52, x-rays of the plaintiff's chest and ribs were taken.  The chest x-ray did not demonstrate any cardiopulmonary disease.  The x-rays of the ribs did not demonstrate any acute bony abnormalities.  [Decl. of Dr. Teophilov, p. 5:7-10; Exh. G Med

Summary, p. 50]

19. Meanwhile, CHS staff was checking the plaintiff's vital signs and assessing his neurological status periodically.  [Decl. of Dr. Teophilov, p. 5:11-13; Exh. F, Plaintiff's jail medical records, p. 232-235]

20. When the plaintiff came to our care, on June 24, 2015, he had an infected wound on his right buttock. CHS staff was changing the wound dressing daily and monitoring the wound healing.  The wound appeared healing and scabbed in the middle on July 14, 2015.  [Decl. of Dr. Teophilov, p. 5:14-18, Exh. F plaintiff's jail medical record p. 223-224]

21. On July 9, 2015 at 21:35 hours, July 13, 2015 at 21:26 hours, and July 15, 2015 at 21:30 hours, the MCJ was on a lock down and Nurse Rivera could not change of the wound dressing.  [Decl. of Dr. Teophilov, p. 5:19-22, Exh. F plaintiff's jail medical record, p. 220, 226, 231]

22. CHS staff changed the wound dressing on July 10, 2015, July 11, 2015, July 12, 2015, July 14, 2015, July 16, and July 17, 2015.  The changes of the wound dressing continued through the rest of the month of July 2015 and the month of August 2015.  [Decl. of Dr. Teophilov, p.5:23-6:2; Exh. F plaintiff's jail medical record, p. 125-

215, 218, 223, 228, 229]

23. On July 10, 2015 at 19:00 hours, Nurse Sanchez recorded in the medical record that the plaintiff complained of pain in his jaw and poor sleep.  He requested a soft diet. [Decl of Dr. Teophilov, p.6:3-7; Exh. F plaintiff's jail medical record, p.231]

24. On July 13, 2015 at 20:29 hours, Nurse Perey recorded in the medical record that during pill call the plaintiff complained of a nosebleed for five days.  He denied having headache or dizziness.  Nurse Perey checked the plaintiff's vital signs, he was alert and fully oriented.  His breathing was not labored.  Nurse Perey did not observe

any bleeding from the plaintiff's nose.

[Decl. of Dr. Teophilov, p. 6:8-13;

Exh. F plaintiff's jail medical record,

p.228]

25. On July 14, 2015 at 14:36 hours, Nurse Robles recorded in the medical record that she and Nurse Rubio responded to a call for a medical emergency, i.e. a man down call, involving the plaintiff in MCJ housing module 3500.  Nurse Robles found the plaintiff sitting on the floor inside his cell.  He complained of chest pain 10/10.  He was alert and fully oriented.  He was not in respiratory distress.  The nurses assisted him to lie on a gurney.  He was wheeled from his cell to MCJ main clinic on the gurney while escorted by Deputy

Borja. [Decl. of Dr. Teophilov, p.6:14-

23, Exh. F plaintiff's jail medical

record, p.227]


26. On July 14, 2015 at 15:00 hours,

Nurse Monsanto recorded in the

medical record that she evaluated the

plaintiff in MCJ main clinic.  The

plaintiff complained his chest, back,

jaw, mouth, nose and rib cage were

hurting, 10/10, for five to six days.

He had throbbing headaches and he

could not sleep.  The plaintiff stated

he had been assaulted "by more than

30 people in the dorm."  He

complained it was hard to breathe

because his chest was hurting and his

nose was broken.  Nurse Monsanto

found the plaintiff's breathing was

even and not labored, there were no

chest retractions, he was not using the accessory respiratory muscles to breathe, and he did not have nasal flaring when breathing.  The plaintiff was able to open his mouth fully without limitation.  Nurse Monsanto did not observe any bleeding from his nose.  An EKG was done.  It showed a fast sinus arrhythmia but it was otherwise normal.  Nurse Monsanto called the MOD, Dr. Silvanskaya, and reported the plaintiff's condition to Dr. Silvanskaya.  CHS staff called the ambulance service.  At 16:30 hours, the ambulance service transported the plaintiff on a gurney out of MCJ main clinic to the Los Angeles County + University of Southern California Medical Center ("LAC+USC").  Deputies Wu and Wang escorted the

ambulance.  [Decl. of Dr. Teophilov, p.6:24-7:20, Exh. F plaintiff's jail medical record, p.223-226]

27. On July 14, 2015 at 23:26 hours, Nurse Fernandez recorded in the medical record that the plaintiff returned from LAC+USC.  The plaintiff asked to see a dentist to have his top four front teeth reinserted.  He said he was assaulted by several inmates one week previously.  He also requested a soft diet, a stronger pain medication, and a wheelchair. [Decl. of Dr. Teophilov, p.7:22-8:2; Exh. F plaintiff's jail medical record, p.222]

28. On July 15, 2015 at 21:21 hours, Nurse Vicente recorded in the medical record that he and Nurse Rivera

responded to another man down call

involving the plaintiff.  The plaintiff

was laying on the floor of his cell.  He

complained of generalized body pain

and headache.  He stated that 30 to 40

inmates had beaten him up a week

previously.  The nurses did not

observe any visible injuries.  The

plaintiff was not in distress and he was

able to move all parts of his body

without difficulty.  He was able to get

up from the floor and lie on a gurney

with minimal assistance.  He was

wheeled from his cell to MCJ main

clinic on the gurney.  Nurse Vicente

reviewed the documentation in the

medical record and noted the plaintiff

had been evaluated at LAC+USC the

previous day for complaints of chest

pain and that his EKG was normal.

[Decl. of Dr. Teophilov, p.8:4-17;

Exh. F, plaintiff's jail medical record,

p.220-221]

29. At the time of Nurse Vicente's assessment, the plaintiff denied having chest pain.  Dr. Silvanskaya, prescribed one dose of Clonidine, 0.1 mg, by mouth, and Robaxin, 750 mg, tree times daily, by mouth, as needed for pain.  The plaintiff remained in MCJ main clinic for further monitoring of his blood pressure.  At 23:42 hours, Nurse Alo recorded in the medical record that it was clinically appropriate for the plaintiff to return to his housing module. Nurse Alo arranged for the plaintiff to be evaluated by a physician on the following day. [Decl. of Dr.

Teophilov, p.8:18-9:2 Exh. F

plaintiff's jail medical record, p.220,

221]

30. On July 16, 2015 at 1346 hours,

Nurse Sevilla recorded in the medical

record that she responded with Nurse

Robles to a man down call involving

the plaintiff in MCJ housing module

3500.  The plaintiff complained of

having chest pain because he had been

"beaten up outside."  He could not

remember the name of the medication

he had taken at home for blood

pressure.  He wanted to be given

Norco, not Motrin, for pain.  The

plaintiff was wheeled to MCJ main

clinic on a gurney.  An EKG was

done. [Decl. of Dr. Teophilov, p.9:4-

11;  Exh. F plaintiff's jail medical

record, p.218-219]

31. On July 16, 2015 at 14:33 hours, Dr. Little, a physician in the MCJ, recorded in the medical record that LAC+USC staff had already referred the plaintiff to various clinics at LAC+USC for follow up.  Dr. Little ordered soft diet and a walker to accommodate the plaintiff's limited ability to walk, caused by his generalized body pain.  At 15:15 hours, Nurse Galindo documented the plaintiff was not in distress and Deputy Cortez escorted him to his housing module. [Decl. of Dr. Teophilov, p.13-20; Exh. F plaintiff's jail medical record, p.216,217]

32. On July 16, 2015 at 19:32 hours,

Nurse Jacob recorded in the medical record that he and Nurse Galindo responded to another man down call. The plaintiff was lying on the floor of his cell.  The two nurses assisted him to get up from the floor and to lie on a gurney.  Then the plaintiff closed his eyes and would not respond to verbal stimuli.  He opened his eyes when an open bottle with ammonia was placed under his nostrils.  He was wheeled to MCJ main clinic on the gurney.  In MCJ main clinic he was not in distress, his breathing was not labored, he followed commands, and he did not exhibit signs of pain or discomfort. [Decl. of Dr. Teophilov, p.9:21-10:6; Exh. F plaintiff's jail medical record, p.215,216]

33. On July 16, 2015 at 2016 hours, Nurse Jacob continued to monitor the plaintiff's condition.  Dr. Silvanskaya prescribed a medication for his blood pressure.  Nurse Jacob noted that Dr. Little had ordered a walker for the plaintiff.  Dr. Silvanskaya ordered to house the plaintiff in MCJ housing module 7100, a medical outpatient specialty housing ("MOSH") module. Nurse Moscoso, who was at the desk in the MOSH module, called and said there was a bed available and that he would find a walker when the plaintiff arrived at the MOSH module.  [Decl. of Dr. Teophilov, p.10:7-16; Exh. F plaintiff's jail medical record, p.215]

34. On July 16, 2015 at 2152 hours, Nurse Moscoso recorded in the

medical record that the plaintiff was housed in MCJ housing module 7100. The plaintiff said that he and his brother had been beaten up by inmates.  He complained his whole body was in severe pain, his nose was broken, his right mandible was broken, he had a bad headache, a dislocated shoulder, and his right foot was numb. [Decl. of Dr. Teophilov, p.10:18-24; Exh. F plaintiff's jail medical record, p.213, 214]

35. On July 18, 2015 at 13:11 hours, Nurse Ryu recorded in the medical record that she and Nurse Bhanji responded to a man down call involving the plaintiff.  The nurses found him in a prone position on the floor of his cell.  The nurses felt his

pulse over his radial artery.  The

plaintiff kept his eyes closed.  He did

not respond to questions but when

Nurse Ryu asked his name he pointed

to his wrist band with his right index

finger.  The plaintiff was placed on a

gurney and cervical spine precautions

were observed.  He was wheeled to

the 7100 nursing station on the

gurney.  Nurse Practitioner ("NP")

Konian ordered the intravenous ("IV")

infusion of normal saline and

monitoring of the plaintiff's condition.

At 13:45 hours, Nurse Gonzaque

observed the plaintiff was awake and

he was manipulating the rate of his IV

infusion.  NP Konian ordered the IV

infusion to be discontinued. [Decl. of

Dr. Teophilov, p.11:1-15; Exh. F

plaintiff's jail medical record, p.211-

212]

36. On July 18, 2015 at 15:30 hours, the plaintiff told Nurse Panganiban that his walker had broken and he would rather have a wheelchair. Nurse Panganiban observed the plaintiff was able to move all his extremities without any difficulty.  He was walking inside his cell. CHS staff provided him with a new walker. [Decl. of Dr. Teophilov, p.11:16-21; Exh. F plaintiff's jail medical record, p.209]

37. On July 19, 2015 at 09:45 hours, Nurse Gonzaque recorded in the medical record that she observed the plaintiff inside his cell using a portable phone.  The plaintiff said he

needed help because his blood

pressure was high.  Nurse Gonzaque

asked him to hang up the portable

phone so she could assess him further

but the plaintiff yelled "get out of

here!"  At 10:00 hours, Nurse

Gonzaque evaluated him at the 7100

nursing station.  The plaintiff was

angry and verbally hostile but was not

in apparent respiratory distress.  He

complained of a bad headache, a

fracture of the nose and ribs, high

blood pressure and that he had not

been getting attention for the previous

twelve days.  At 11:48 hours, Nurse

Gonzaque observed the plaintiff eating

his lunch inside his cell, in no distress.

[Decl. of Dr. Teophilov, p.11:23-

12:10; Exh. F plaintiff's jail medical

record, p.208]

38. On July 20, 2015 at 10:48 hours, the plaintiff complained of dizziness and headache to Nurse Chapman.  He was wheeled on a gurney to the 7100 nursing station for further assessment. [Decl. of Dr. Teophilov, p.12:11-14; Exh. F plaintiff's jail medical record, p.206]

39. On July 20, 2015 at 12:00 hours, Dr. Zolnouni, the physician assigned to the MOSH module in MCJ, recorded in the medical record the plaintiff's report of assault.  He complained of left sided rib pain and asked for a wheelchair.  He appeared comfortable, refused to cooperate with the examination and stated he could not stand or walk.  He insisted he

needed a wheelchair.  Dr. Zolnouni

encouraged him to remain active and

to use the walker as needed.  She also

noted that he was already receiving

Norco and Robaxin for treatment of

his pain. [Decl. of Dr. Teophilov,

p.12:15-24; Exh. F plaintiff's jail

medical record, p.204-205]


40. On July 20, 2015 at 21:00 hours,

Nurse Olivares recorded in the

medical record that the plaintiff stated

he had high blood pressure and his

chest was hurting, the pain was not

radiating.  He felt dizzy, he had a

headache, and he wanted a

wheelchair.  EKG was done.  His

blood pressure was 150/104 and

163/88.  Dr. Silvanskaya ordered a

medication for his blood pressure and

added analgesic balm to his other pain medications. [Decl. of Dr. Teophilov, p.13:1-8; Exh. F plaintiff's jail medical record, p.203, 204]

41. On July 21, 2015 at 14:22 hours, Nurse Anderson recorded in the medical record that the plaintiff complained of headache and pain in multiple parts of his body after his fall on July 15, 2015.  The findings of Nurse Anderson's assessment of the plaintiff's physical condition were unremarkable.  She arranged for him to be taken to the UCC in the TTCF for further evaluation later in the day. Dr. Zolnouni ordered x-rays of the plaintiff's left shoulder, left hip and left ribs.  The findings of the x-rays were unremarkable. [Decl. of Dr.

Teophilov, p. 13:9-16;  Exh. F

plaintiff's jail medical record, p.200,

201]


42. On July 21, 2015 at 17:21 hours,

Nurse Carlos recorded in the medical

record that the plaintiff was in the

UCC.  He told Nurse Carlos he had

been assaulted by "40 people" on July

7, 2015.  He was evaluated at, and

then discharged from, the LAC+USC

on the same day.  The plaintiff

reported having a headache and pain

in his left shoulder, left hip, and left

rib cage. [Decl. of Dr. Teophilov,

p.13:18-23; Exh. F plaintiff's jail

medical record, p.197-198]


43. On July 21, 2015 at 19:37 hours,

Dr. Cervantes, a physician in the UCC

at that time, recorded in the medical

record the plaintiff's complaints and

the findings of the plaintiff's physical

examination.  Dr. Cervantes reviewed

the x-rays of the plaintiff's left

shoulder, left hip and left ribs.  The x-

rays were unremarkable.  Dr.

Cervantes ordered a CT scan of the

plaintiff's head.  The CT scan

demonstrated fractures of

undetermined age of the two nasal

bones.  There was no acute

intracranial abnormality.  Dr.

Cervantes concluded that there was no

indication for any additional health

services at that point.  He

recommended the plaintiff to be

followed by CHS staff in his housing

module, i.e. on MD line, for the

continuation of the plaintiff's routine

health care.  [Decl. of Dr. Teophilov,

p.13:24-14:11; Exh. F plaintiff's jail

medical record, p.194-195]

44. On July 22, 2015, at 08:00 hours,

Nurse Asogu recorded in the medical

record that the plaintiff told her "I am

not coming out for my dressing

change, I will write you up, I don't

need your help, I have order for

wheelchair, I need a wheelchair to

come out, I can't walk."  Nurse Asogu

observed the plaintiff walking inside

his cell without a walker.  She

encouraged him to come for his

dressing change three times but he

continued to refuse.  She educated him

on the importance of the dressing

change.  At 13:05 hours, the plaintiff

returned from the MCJ attorney room.

He declined to take the medication

Robaxin. [Decl. of Dr. Teophilov,

p.14: 12-23; Exh. F plaintiff's jail

medical record, p.193]


45. On July 23, 2015 at 04:35 hours,

Nurse Nery recorded in the medical

record that the plaintiff had an

appointment with the ear, nose and

throat ("ENT") clinic at LAC+USC

and a court appearance.  The plan was

to excuse the plaintiff from his court

appearance for that day and to send

him to LAC+USC for his appointment

with the ENT clinic.  At 09:31 hours,

the plaintiff demanded to be given a

wheelchair as a condition for him to

go LAC+USC.  Dr. Zolnouni

observed him walking without the

need for an assistive device.  At 09:35

hours, Nurse Hayashida documented

that the plaintiff refused to go to

LAC+USC for his ENT appointment.

He signed the release of responsibility

form. [Decl. of Dr. Teophilov,

p.14:24-15:10; Exh. F plaintiff's jail

medical record, p.188, 189, 190]

46. On July 23, 2015 at 10:46 hours,

Nurse Acquah recorded in the medical

record that he responded to the

plaintiff's cell after receiving a man

down call.  The plaintiff was standing

in front of his cell leaning on his

walker.  He was wheeled to the 7100

nursing station on a gurney.   Nurse

Acquah found that the plaintiff was

not in distress, there was no bleeding,

and his extremities had full range of

motion and good muscle tone.  The

plaintiff insisted on calling an ambulance to take him to his appointment at LAC+USC.  Dr. Zolnouni determined that there was no clinical indication to call an ambulance.  [Decl. of Dr. Teophilov, p.15:11-22; Exh. F plaintiff's jail medical record, p.187, 188]

47. On July 23, 2015 at 19:32 hours, Dr. Silvanskaya prescribed Motrin, 800 mg, twice daily, by mouth, as needed for pain.  [Decl. of Dr. Teophilov, p.15:23-25; Exh. F plaintiff's jail medical record, p.186]

48. On July 24, 2015 at 00:20 hours, Nurse Nery recorded in the medical record that he responded to the plaintiff's cell after receiving a man

down call.  He found the plaintiff

lying on the floor of his cell.  The

plaintiff stated he was sitting on the

chair when he passed out and fell on

his back.  He thought he had a

staphylococcal infection on his

buttocks.  Nurse Nery did not find any

apparent injuries and assisted the

plaintiff to lie on a gurney.  The

plaintiff was wheeled to the 7100

nursing station on the gurney for

further evaluation.  There was an

induration, 1 inch in diameter, on the

plaintiff's left buttock.  There was no

open wound or drainage.  Nurse Nery

cleansed and dressed the area.  [Decl.

of Dr. Teophilov, p.16:1-13;  Exh. F

plaintiff's jail medical record, p.183,

184]

49. On July 24, 2015 at 13:56 hours, Dr. Pryor, one of the physicians assigned to MCJ, suspected the plaintiff might have altered level of consciousness and ordered the plaintiff to be taken to LAC+USC by paramedics for further evaluation. [Decl. of Dr. Teophilov, p.16:14-18; Exh. F plaintiff's jail medical record, p.182-183]

50. On July 25, 2015 at 01:14 hours, Nurse Rosal recorded in the medical record that the plaintiff had returned from LAC+USC. At LAC+USC the plaintiff had a normal CT scan of the head, unremarkable laboratory results, and a normal EKG. Dr. Tung, the physician on duty in the Inmate Reception Center ("IRC") at that time,

reviewed the LAC+USC

documentation.  [Decl. of Dr.

Teophilov, p.16:19-24; Exh. F

plaintiff's jail medical record, p.180-

181]

51. On July 26, 2015 at 21:59 hours,

Nurse Besijos recorded in the medical

record that the plaintiff complained of

pain in his shoulder.  He did not want

to use the walker, he wanted to have a

wheelchair instead.  An EKG was

done.  It showed sinus rhythm with a

variable ventricular rate of 71 to 122

beats per minute.  Dr. Silvanskaya

referred the plaintiff for an evaluation

on the next day by his treating

physician in the MOSH module.  The

plaintiff was in court on July 27, 2015.

[Decl. of Dr. Teophilov, p.17:1-9;

Exh. F  plaintiff's jail medical record,

p.173-174]

52. On July 27, 2015 at 21:04 hours,

Nurse Bankole recorded in the

medical record that the plaintiff asked

for Norco and a wheelchair after he

had returned from court. [Decl. of Dr.

Teophilov, p.17:10-13; Exh. F

plaintiff's jail medical record, p.172-

173]

53. On July 30, 2015 at 11:33 hours,

Dr. Zolnouni recorded in the medical

record her examination of the plaintiff.

She noted that Dr. Little had ordered a

soft diet for the plaintiff on July 16,

2015.  She also prescribed Norco, one

tablet three times daily, by mouth, as

needed for pain.  She observed that

LASD staff had already given the plaintiff a wheelchair.  [Decl. of Dr. Teophilov, p.17:14-19;  Exh. F plaintiff's jail medical record, p.169-170]

54. During the month of August 2015, CHS staff continued to change the wound dressing on the plaintiff's right buttock. [Decl. of Dr. Teophilov, p.17:20-22; Exh. F plaintiff's jail medical record,]

55. On August 2, 2015 at 20:29 hours, Nurse Welch recorded in the medical record that the plaintiff reported a nosebleed and pain in his left shoulder, left hip, and ribs. [Decl. of Dr. Teophilov, p.17:23-25; Exh. F plaintiff's jail medical record, p.166]

56. CHS staff assessed the plaintiff's
condition on August 4, 2015, August
7, 2015, August 11, 2015 and August
13, 2015.  [Decl. of Dr. Teophilov,
p.18:1-3; Exh. F plaintiff's jail
medical record, p.154-165]

57. On August 11, 2015 at 12:21,
Nurse Ambeguia recorded in the
medical record that the plaintiff had
refused to go to LAC+USC for an
appointment with a specialist.  The
plan was to reschedule the
appointment.  [Decl. of Dr. Teophilov,
p.18: 4-6; Exh. F plaintiff's jail
medical record, p.159]

58. On August 13, 2015 at 11:05
hours, Dr. Fong, one of the dentists in

MCJ, recorded in the medical record

the findings of the plaintiff's dental

examination.  Dr. Fong referred him to

the dental specialists at LAC+USC

because of discomfort in the jaw.

[Decl. of Dr. Teophilov, p. 18:8-12;

Exh. F plaintiff's jail medical record,

p.155-156]


59. On August 14, 2015 at 10:30

hours, Dr. Boston, the

ophthalmologist in MCJ, recorded in

the medical record the findings of the

plaintiff's eye examination.  She gave

the plaintiff a prescription for

corrective lenses, i.e. glasses, to

accommodate his refractive error.  She

also sent the plaintiff to the UCC in

the TTCF for a re-evaluation of his

headache.  Additionally, Dr. Boston

referred the plaintiff to the neurology

specialists at LAC+USC for

evaluation of the same complaint.

[Decl. of Dr. Teophilov, p.18:12-20;

Exh. F plaintiff's jail medical record,

p.152-154]


60. On August 14, 2015 at 13:08

hours, PA DeHaro and Dr. Palmisano,

both providers in the UCC, recorded

in the medical record a summary of

the plaintiff's complaints.  The

plaintiff did not report any new

complaints.  His physical examination

was unremarkable.  PA DeHaro

ordered a wheelchair for 30 days.

[Decl. of Dr. Teophilov, p.18:21-19:2;

Exh. F plaintiff's jail medical record,

p.147-148]

61. On August 17, 2015 at 19:50 hours, Nurse Crowder recorded in the medical record that the plaintiff was transported by a patrol car to LAC+USC for evaluation of dizziness and headache while he was in the shower.  An EKG was done and it was normal.  The plaintiff was discharged from LAC+USC and he returned to the MOSH module in the MCJ on the following day.  Dr. Zolnouni reviewed the LAC+USC documentation. [Decl. of Dr. Teophilov, p.19:3-10; Exh. F plaintiff's jail medical record, p.137-138]

62. On September 1, 2015 at 00:51 hours, Nurse Fernandez recorded in the medical record that the plaintiff had been discharged from Olive View

Medical Center.  The plaintiff had been in court the previous day and had been taken to Olive View Medical Center directly from court.  Dr. Zolnouni reviewed the documentation from Olive View Medical Center on the following day. [Decl. of Dr. Teophilov, p.19:11-18; Exh. F plaintiff's jail medical record, p.132-133]

63. On September 3, 2015, September 4, 2015, and September 5, 2015 CHS staff addressed various complaints, including the plaintiff's kosher diet, the accuracy of the machine for measuring the blood pressure and sore throat. [Decl. of Dr. Teophilov, p.19:19-22; Exh. F plaintiff's jail medical record, p.125-130]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

64. On September 7, 2015 at 14:05 hours, Nurse Suba recorded in the medical record that he and Nurse Holt responded to a man down call.  They found the plaintiff lying on the floor of his cell.  He refused to speak to the nurses.  He was not in distress.  The plaintiff was wheeled in his wheelchair to the 7100 nursing station for observation.  While at the 7100 nursing station he became irritable. Nurse Suba tried to explain to the plaintiff the rationale behind his pain medication regimen but the plaintiff did not want to hear the explanations. [Decl. of Dr. Teophilov, p.19:23-6; Exh. F plaintiff's jail medical record, p.122-123]

65. During the month of September 2015 CHS staff reviewed the plaintiff's health care in response to an ACLU request and a written complaint.  [Decl. of Dr. Teophilov, p.20:7-9]

66. On September 14, 2015 at 13:27 hours, Dr. Yao, one of the dentists in MCJ, recorded in the medical record the findings of the plaintiff's dental examination.  Dr. Yao noted that the plaintiff had already been referred to the dental specialists at LAC+USC. LASD staff could not transport the plaintiff to his dental appointment at LAC+USC on September 17, 2015 because of the limited availability of wheelchair vans.  [Decl. of Dr. Teophilov, p.20:10-16; Exh. F

plaintiff's jail medical record, p.115-
116]

67. On September 22, 2015 the
plaintiff refused to go to LAC+USC
for an appointment with the neurology
specialists.  [Decl. of Dr. Teophilov,
p.20; 17-19; Exh. F plaintiff's jail
medical record, p.112]

68. On September 24, 2015 at
approximately 10:20 hours, Nurse
Portiz and Nurse Sanchez responded
to a man down call and went to the
plaintiff's cell in MCJ housing module
3500 module.  The nurses observed
the plaintiff lying on the floor of his
cell with closed eyes.  He did not
respond to the nurses' questions.  His
breathing was even and not labored.

His pulse was strong.  The nurses did not observe any injuries.  The nurses started and IV line with normal saline and asked custody staff to call the paramedics.  The paramedics took the plaintiff to LAC+USC.  Six hours later he was discharged from LAC+USC and returned to MCJ.  Nurse Besijos reviewed the LAC+USC documentation and conveyed the information to Dr. Young, the MOD at that time.  Dr. Young adjusted the dose of plaintiff's blood pressure medication.  [Decl. of Dr. Teophilov, p.20:20-21:9; Exh. F plaintiff's jail medical record, p.107-111]

69. On September 27, 2015 at 11:58 hours, Nurse Bhanji recorded in the

medical record that he and Nurse Kim responded to a man down call involving the plaintiff in MCJ housing module 1750, a disciplinary housing module.  The plaintiff was lying on the floor of the cell.  He was not in distress and no injuries were visible. The plaintiff did not respond to the nurses' questions.  The custody staff were trying the take the plaintiff to MCJ main clinic for an evaluation but the plaintiff did not cooperate with the instructions of the custody staff. Inmates from the neighboring cells started yelling and cursing at the nurses.  The nurses were not able to assess the plaintiff's condition. [Decl. of Dr. Teophilov, p.21:10-21; Exh. F plaintiff's jail medical record, p.105-107]

70. Subsequently, during the mid-day pill call, Nurse Pan documented that the plaintiff refused to take his blood pressure medication.  The plaintiff took his medications during the evening pill call.  On the following day, the plaintiff refused to allow the measurement of his blood pressure in the morning but agreed to it in the afternoon.  [Decl. of Dr. Teophilov,  p. 21:21-22:2; Exh. F plaintiff's jail medical record, p.104]

71. On September 29, 2015, Dr. Williams, a physician performing telemedicine evaluations, and on September 30, 2015, Dr. Pryor determined that the plaintiff needed to be housed in a housing module in

which he would have a wheelchair.

The plaintiff was housed in MCJ

housing module 8200 with a

wheelchair.  [Decl. of Dr. Teophilov,

p.22:3-9; Exh. F plaintiff's jail

medical record, p.102-103]


72. CHS staff continued to deliver

various health care services to the

plaintiff through the month of October

2015. Examples included, but were

not limited to: evaluations by

physicians, assessments by nurses,

measurements of the plaintiff's vital

signs, changes of the wound dressing

on the plaintiff's right buttock,

administration of prescribed

medications, review of the plaintiff's

written requests for health care, an

emergency transfer to LAC+USC, and

transportation to LAC+USC for the plaintiff's routine appointments with various specialists there.  [Decl. of Dr. Teophilov, p.22:10-19; Exh. F plaintiff's jail medical record, p.84-97]

73. On October 15, 2015, Nurse Bangan-Lorenzo determined that the wound on the plaintiff's right buttock had healed.  The change of the wound dressing was no longer clinically indicated and it was discontinued. [Decl. of Dr. Teophilov, p.22:20-23; Exh. F plaintiff's jail medical record, p.89-90]

74. On October 27, 2015, I reviewed the plaintiff's medical record in response to a request from a

Supervising Judge of the Superior

Court of California in the County of

Los Angeles.  The Supervising Judge

advised me that if the plaintiff could

not walk at all without a wheelchair,

his criminal case would be moved to a

courtroom designated for defendants

in wheelchairs.  I reviewed the

plaintiff's medical record and

concluded that the plaintiff had not

completely lost his ability to walk.

His self-reported inability to walk was

not supported by any objective

findings.  The plaintiff had had

numerous evaluations of his mobility

and no abnormalities were found to

explain the sudden loss of his ability

to walk.  There was no medical

indication for him to need a

wheelchair inside the courtroom.  In

abundance of caution, I accommodated the plaintiff to be in wheelchair during his transportation to the court building. [Decl. of Dr. Teophilov, p.22:24-23:14; Exh. F plaintiff's jail medical record, p.86-87]

75. CHS staff continued to deliver various health care services to the plaintiff through the month of November 2015. Examples included, but were not limited to: evaluations by physicians, assessments by nurses, measurements of the plaintiff's vital signs, administration of prescribed medications, review of a request from the ACLU and the plaintiff's written complaints about health care, an emergency transfer to LAC+USC, and

transportation to LAC+USC for

previously scheduled routine

appointments with various specialists

there. [Decl. of Dr. Teophilov,

p.23:15-24; Exh. F plaintiff's jail

medical record, p.69-83; Exh H Med

Summary, p.62-65]

76. On November 12, 2015, Dr.

Felahy, one of the physicians in MCJ,

wanted to send the plaintiff to

LAC+USC for evaluation of self-

reported "blackouts".  CHS staff

called an ambulance to transport the

plaintiff to LAC+USC but the plaintiff

refused to go.  On the following

morning the plaintiff refused to allow

Dr. Felahy to evaluate him.  In the

evening of the same day the plaintiff

complained of chest pain.  Nurse

Rivera assessed his condition and did not observe any abnormal findings. His EKG was normal. [Decl. of Dr. Teophilov, p.24:1-9; Exh. H Med Summary, p. 64-66]

77. On November 20, 2015, the plaintiff wanted his diet to be changed to vegetarian and soft.  He also refused his blood pressure medication. [Decl. of Dr. Teophilov, p.24:10-12; Exh. H, Med Summary p. 63-64]

78. On November 23, 2015, the plaintiff told Dr. Felahy that he was refusing his blood pressure medications, and he now wanted a vegetarian diet, no more kosher diet. He threatened to report Dr. Felahy to the FBI.  Inmates receive vegetarian

diet based on cultural or religious

considerations.  Providing a religious

diet is outside the scope of health care.

CHS staff conveyed the plaintiff's

request for a vegetarian diet to Ms.

Saldana, a Registered Dietitian.  On

November 24, 2015, she approved the

change of the plaintiff's diet from

Kosher to vegetarian. [Decl. of Dr.

Teophilov, p.24: 13-22;  Exh H, Med

Summary, p. 64-65]

79. CHS mental health ("MH") staff

initially evaluated the plaintiff on June

26, 2015 during his health screening

in the IRC.  Nurse Napoleon, a MH

clinician, documented the plaintiff's

report of anxiety, depression, and

chronic use of illicit drug.  There was

no clinical indication to prescribe

treatment with a psychotropic

medication at that time. [Decl. of Dr.

Teophilov, p.24:23-25:3; Exh. I

plaintiff's Mental health record, p.81-

83]

80. On November 13, 2015,

Psychiatric Technician Meza, one of

the MH clinicians in MCJ, evaluated

the plaintiff subsequent to a referral

for a MH evaluation made by custody

staff.  Mr. Meza interviewed the

plaintiff and found his mental

examination to be normal.  He

instructed the plaintiff how to request

MH evaluations in the future, if

needed.  [Decl. of Dr. Teophilov,

p.25:4-9; Exh I plaintiff's jail mental

health record, p. 78]

81. On November 26, 2015, Mr. Meza interviewed the plaintiff again.  The plaintiff's mental examination was normal.  In abundance of caution, Mr. Meza referred the plaintiff to a psychiatrist for consideration of treatment with psychotropic medications, i.e. "psychiatry line". [Decl. of Dr. Teophilov, p. 25:10-14; Exh I plaintiff's jail mental health record, p.77-78]

82. CHS staff continued to deliver various health care services to the plaintiff through the month of December 2015. Examples included, but were not limited to: evaluations by physicians for physical health concerns, evaluations by a psychiatrist and a psychiatric technician for mental

health concerns, assessments by

nurses, measurements of the plaintiff's

vital signs, administration of

prescribed medications, review of

written requests for health care and

written complaints about health care,

and transportation to an appointment

with the neurology specialists at

LAC+USC. [Decl. of Dr. Teophilov,

p.25:15-24; Exh. H Med Summary p.

52-61; Exh I, plaintiff's mental health

record, p. 72-76]

83. On December 1, 2015, the

LAC+USC neurology specialists

designed a plan to work up the

plaintiff's complaints by performing

several diagnostic studies.  They also

recommended treatment with

Topomax, Magnesium Oxide and

Riboflavin (Vitamin B2).  [Decl. of

Dr. Teophilov, p.26:1-5; Exh. H, Med

Summary, p.59-61]

84. On December 3, 2015, the plaintiff

took his medications from the pill call

nurse and threw them away, cursing at

the nurse and the accompanying

deputy.  He said he would write them

up and that the watch commander, his

lawyers, and the FBI would

investigate them.  [Decl. of Dr.

Teophilov, p.26:6-10; Exh. H, Med

Summ, p. 58]

85. On December 26, 2015, the

plaintiff told Mr. Meza that in order

for him to be housed in the TTCF, the

plaintiff would declare having suicidal

ideation.  In abundance of caution, on

the following day, the plaintiff was

moved from MCJ housing module

8200 to a MH housing module in the

TTCF, housing module 172, for closer

observation of his mental status.

[Decl. of Dr. Teophilov,p.26:11-16;

Exh. I, mental health record, p. 73-74]

86. CHS staff continued to deliver

various health care services to the

plaintiff through the month of January

2016. Examples included, but were

not limited to: evaluations by

physicians and nurse practitioners for

physical health concerns, a dental

evaluation, evaluations by

psychiatrists and MH clinicians for

mental health concerns, assessments

by nurses, measurements of the

plaintiff's vital signs, administration

of prescribed medications, admission

to the Correctional Treatment Center

("CTC"), a licensed in-patient module

within the TTCF, an emergency

transfer to LAC+USC, and

transportation to a routine

appointment for diagnostic tests at

LAC+USC.  [Decl. of Dr. Teophilov,

p.26:18-27:2; Exh. H Med Summ p.

27-54]

87. On January 1, 2016, Dr.

Kamalnath, a psychiatrist in the

TTCF, evaluated the plaintiff's mental

health.  [Decl. of Dr. Teophilov,

p.27:4-5; Exh I plaintiff's jail mental

health record, p.71-72]

88. On January 6, 2016 and January 9,

2016, Dr. Simpson, a psychiatrist in

the TTCF, evaluated the plaintiff's

mental health. [Decl. of Dr.

Teophilov, p.27:6-8;  Exh I plaintiff's

jail mental health record, p.70-71]


89. On January 6, 2016, Dr. Fong, a

dentist in the TTCF, examined the

plaintiff.  He prescribed medications

and referred the plaintiff for further

dental treatment to the dental

specialists at LAC+USC. [Decl. of Dr.

Teophilov, p.27:9-11]


90. On January 9, 2016, I examined

the plaintiff and documented my

review of the diagnostic studies which

had been performed up to that

moment.  I also noted that some

diagnostic studies at LAC+USC had

not been performed yet.  I adjusted the

plaintiff's treatment regimen for pain.

I ordered the use of a wheelchair

while the plaintiff's work up for nerve

damage at LAC+USC was in progress.

[Decl. of Dr. Teophilov, p.27:13-19;

Exh. H Med Summ, p. 47-48]

91. On January 12, 2016 at

approximately 01:25 hours, the

paramedics transported the plaintiff to

LAC+USC for an evaluation after he

reported he had fallen from his

wheelchair to the floor and had hit his

face.  Six hours later the plaintiff

returned from LAC+USC.  Dr.

Laughlin, a physician in the TTCF,

reviewed the documentation from

LAC+USC and examined the plaintiff.

Dr. Laughlin documented that the CT

scans of the plaintiff's head and spine

were unremarkable.  Dr. Laughlin found the plaintiff was neurologically intact.  Later on the same day the plaintiff was housed in MCJ housing module 7100, a MOSH housing module. [Decl. of Dr. Teophilov, p.27:20-28:5; Exh. H Med Summ, p. 42-43]

92. On January 14, 2016, the plaintiff was transported to LAC+USC for previously scheduled routine diagnostic studies as ordered by the neurology specialists at LAC+USC. The diagnostic studies were normal. There were no objective findings that could explain the plaintiff's reported weakness and inability to walk.  [Decl. of Dr. Teophilov, p.28:6-11; Exh. H, Med Summ, p. 39]

93. From January 21, 2016 to January 27, 2016, the plaintiff was admitted to the CTC for in-patient treatment of his suicidal ideation and physical health problems.  During his admission he was evaluated several times by a psychiatrists, by two NPs, one PA, and a registered dietician.  He received in-patient nursing care and administration of prescribed medications. [Decl. of Dr. Teophilov, p.28:13-18; Exh. H, Med Summ, p. 34-36]

94. On January 25, 2016, I summarized the findings of the extensive diagnostic work up which had been performed at LAC+USC in search of a possible explanation for

the plaintiff's reported inability to walk. There were no objective findings to support the plaintiff's reported inability to walk. I discontinued the order for a wheelchair. [Decl. of Dr. Teophilov, p.28:19-24; Exh. H, Med Summ, p. 29-30]

95. CHS staff evaluated and treated the plaintiff's MH complaints extensively, with specific focus on his refusal to eat, and his contention that he was suicidal at various times. The plaintiff reported having suicidal ideation several times and, for his own protection, he was housed in high observation housing ("HOH") modules. The plaintiff contends he was never suicidal, however his

statements and actions were to the

contrary.  It was clinically necessary

to house him in HOH modules during

the times when he reported suicidal

ideation.  [Decl. of Dr. Teophilov,

p.29:1-10]


96. MH clinicians and psychiatrists

continued to evaluate the plaintiff's

mental health in January 2016,

February 2016, March 2016, May

2016, June2016, July 2016, August

2016, and September 2016.  [Decl. of

Dr. Teophilov, p.29:11-14; Exh I,

plaintiff's mental health record]


97. In May 2016, the plaintiff

complained that he was being ignored

and that no one was helping him.  He

wanted to be moved out of MH

housing.  He went on a hunger strike because he wanted his vegetarian diet to be changed to kosher diet.  He had requested the reverse change in November of 2016. [Decl. of Dr. Teophilov,  p.29:15-19; Exh. H, Med Summ, p. 20-21]

98. On May 24, 2016, the plaintiff reported hearing voices telling him to hurt himself and he tried to choke himself.  Dr. Chung, a psychiatrist in the TTCF, evaluated him on May 24, 2016, May 26, 2016, June 3, 2016, June 13, 2016, and June 27, 2016. She offered him to participate in more therapeutic group sessions so he would come out of his cell more often. CHS staff had an interdisciplinary meeting about the plaintiff's attention

seeking and disruptive behavior.

[Decl. of Dr. Teophilov, p.29:20-30:2;

Exh I plaintiff's jail mental health

record, p.3-11]


99. On June 17, 2016, the plaintiff told

psychiatric social worker ("PSW")

Pena that he did not trust the deputies

and did not want to leave his cell.  He

was paranoid about another attack.

PSW Pena explained to the plaintiff

that his behavior was problematic.

The plaintiff had a pattern of

complaining that he had been denied

health services when, in fact, he had

refused these exact same health

services.  [Decl. of Dr. Teophilov,

p.30:4-10; Exh I plaintiff's jail mental

health record, p.98-99]

100. In July of 2016, PSW Pena continued to discuss with plaintiff his refusal of health services.  PSW Pena advised the plaintiff that his behavior was inappropriate.   The plaintiff continued to contend he was suicidal but he had difficulty describing his symptoms.   [Decl. of Dr. Teophilov, p.30:11-15; Exh I plaintiff's jail mental health record, p.93-96]

101. On August 19, 2016 and September 12, 2016, PSW Pena re-evaluated the plaintiff's mental health and continued the discussions related the plaintiff's behavior. [Decl. of Dr. Teophilov, p.30:16-19; Exh I plaintiff's jail mental health record, p.92-93]

102. MH clinicians and psychiatrists continued to evaluate and treat the plaintiff's mental health through the months of July 2016, August 2016, and September 2016. The nurses continued to administer his prescribed medications. [Decl. of Dr. Teophilov, p.30:20-23; Exh I plaintiff's jail mental health record, p.84-91]

103. In September 2016, the plaintiff attended therapeutic group sessions, including learning of relaxation techniques and anger management. [Decl. of Dr. Teophilov, p.30:24-25; Exh I, plaintiff's jail mental record, p.90-91]

104. Based on Dr. Teophilov's education, training, and experience, as

well as his clinical examination of the plaintiff and the review of the medical records, Dr. Teophilov reaches the opinion that the medical treatment Dr. Felahy, Dr. Silvanskaya, Dr. Pryor, Dr. Little, Dr. Zolnouni, Dr. Teophilov, and PA Vivo provided to the plaintiff was well within the standard of care. [Decl. of Dr. Teophilov, P.31:1-6]

105. Based on the above factors, Dr. Teophilov is also able to reach the opinion that the nursing care Nurse Anderson, Nurse Tutt, Nurse Menefee, and Nurse Luna provided to the plaintiff was well within the standard of care, as well. [Decl. of Dr. Teophilov,p.31:8-10]

106. In Dr. Teophilov's professional opinion, CHS staff provided the plaintiff with health care services well above the expected standard in the community. [Decl. of Dr. Teophilov, p.31:11-13]

107. The inmate medical documentation indicates that on June 17, 2016, Nurse Menefee fax'd a completed court order work sheet regarding assessment of a possible concussion.  On June 22, 2016, she brought the patient his ACLU grievance forms.  He took the original forms and refused to return them.  On July 1, 2016, she completed ACLU worksheets and fax'd them to the court order unit. [Declaration of Nurse Menefee, p.1, Exh F, jail medical

records, p. 52-54]

108. Mr. Voskanyan contends that
Nurse Menefee came to his cell on
June 24, 2016 and dropped off
complaint forms that were "falsified
and forged." This is not true. Plaintiff
does not say in what way these forms
were "falsified" or "forged". There is
no evidence that Nurse Menefee
falsified or forged anything. [Decl of
Nurse Menefee, p.1].

109. Deputy Garibay was a Deputy
Generalist at the Men's Central Jail
during 2015. He provided jail security,
Title 15 walks, and helped with
inmate issues. [Declaration of Deputy
Garibay, para.1, page 1]

110. The incident report regarding the inmate on inmate assault of July 7, 2015, reflects that Deputy Garibay took Mr. Voskanyan to the main clinic to be treated for his injuries. Deputy Garibay also provided a narrative for the report, that he was notified Mr. Voskanyan was involved in an altercation.  Mr. Voskanyan told Deputy Garibay he had been punched and kicked in the head, back, front side, mid-section and legs.  Deputy Garibay saw a one inch gash over his left temple.  Mr. Voskanyan told Deputy Garibay he lost consciousness. Deputy Garibay had no other involvement with Mr. Voskanyan. [Decl. of Deputy Garibay, para.2, para. 3, page 1; Exh. E July 7, 2015 Incident Report, p. 16]

111. Hugo Mosquera was a Lieutenant in the Los Angeles County Sheriff's Department during 2015 and 2016. As a Lieutenant, he would not be involved in physically removing an inmate. However, he would be available to talk with inmates who were upset about being transferred or some other circumstance, and would explain the reason, i.e. they need to move to a lower level of care and make room for other inmates who need a higher level of care,  or the order regarding their medication or mobility devices for example, is a medical issue and the deputies are trying to comply with the physician orders.  Lt. Mosquera recalls this happening on at least a few occasions with Mr. Voskanyan.  [Decl. of Lt.

Mosquera, para. 3, page 2]

112. There is a grievance procedure in place for inmates to make complaints. There is a Sergeant specifically assigned to collect and act upon the grievances.  Once the Sergeant has reviewed the grievance for the particular floor, it would go to the Lieutenant assigned.   The grievances are in triplicate so they can be carefully tracked.  The inmate retains a copy.  As a Lieutenant, once Lt. Mosquera received the grievance, he would also review it and it was his custom to speak with the deputies involved and work to ensure the complaints are addressed. Sometimes inmates will make informal complaints and ask to speak to the

Watch Commander.  If Lt. Mosquera was available, he would speak to the inmate and try and determine what was going on with the inmate. [Decl. of Lt. Mosquera, para. 4, para. 5,page 2]

113. Lt. Mosquera would not tolerate the type of behavior claimed by the plaintiff, such as Deputy Abril teasing or taunting him and engaging in name calling.  Lt. Mosquera would never resort to name calling towards inmates.  It was his job to attempt to diffuse conflict and ensure professional and appropriate behavior. He did not engage in the behavior complained of by plaintiff. [Decl. of Lt. Mosquera, para.6, p.2-3]

114.  On December 26, 2015, Mr. Voskanyan complained of needing to go "suicidal" in order to get dental work.  The floor deputy on 8200 requested JMET to allow the mental health professionals assess him. Mr. Voskanyan was assessed and could not contract for safety.  He was placed on risk precautions after being assessed by mental health.  [Decl. of Lt. Mosquera, para. 7, p.3]

115. Everything that Lt. Mosquera observed and was aware of at the jail involving Mr. Voskanyan with regard to the Custody staff was done according to policy.  He would not tolerate inappropriate or unprofessional behavior.  [Decl of Lt. Mosquera, para. 8, page 2].

116.  Contrary to plaintiff's
allegations, plaintiff was **not** kept in a
"keep away" cell between July 8 and
July 16, 2015.  He was not hidden
from medical staff or family.  His cell
did not have "feces" on the floor.
[Decl of Deputy Upchurch, para.2-5,
p. 1-2; Decl of Deputy Haas, para.2-5,
p. 1-2.]

117.  Deputies would not be able to
place someone in a cell with "feces"
on the floor.  That is health hazard and
would be observed by the nurses that
come down the rows twice per day.
[Decl of Deputy Upchurch, para.2-5,
p. 1-2; Decl of Deputy Haas, para.2-5,
p. 1-2.]

118.  There were two pill calls each day.  One was for self-mediations and the other involved a nurse with a full cart going down the rows of cell dispensing prescription medication. This was the time when inmates would be able to voice concerns and requests.  The nurses see all the inmates as they walk down the rows when they do pill call, and no one would be able to "hide" an inmate there as plaintiff contends.  [Decl of Deputy Upchurch, para.2-5, p. 1-2; Decl of Deputy Haas, para.2-5, p. 1-2.]

119.  Between July 8, 2015 and July 16, 2015, plaintiff was seen on several occasions by medical staff. [Declaration of Dr. Teophilov, para.

16 through 32; Exh. F plaintiff's jail

medical records. P. 212-244].

120.  Mr. Voskanyan was also critical

of Deputy Zuniga for writing him up

concerning his allegation that he did

not receive some of his commissary

items on August 24, 2015.  On that

date Deputy Zuniga was escorting

commissary deliveries to the 7100

hard row.  When deputies approached

Mr. Voskanyan's cell, he complained

that he did not receive his entire list of

items.  The commissary staff noted

there were two bags delivered and

only one was in front of his cell.

Deputy Zuniga went to the Watch

Sergeants' office and reviewed the

video and saw a trustee place two bags

in front of Mr. Voskanyan's door.

The video showed that at 1934 hours Mr. Voskanyan can be seen reaching out of his tray slot and grabbing one store bag.  Mr. Voskanyan was written up for stealing, and creating a physical and operational disturbance.  In the judgment of Deputy Zuniga, the disciplinary report was warranted in light of Mr. Voskanyan's conduct. [Exh K, Discipline reports, p. 2]

121.   Mr. Voskanyan alleges that Deputy Lew cancelled a family visit on August 21, 2015 and cancelled an attorney visit on August 24, 2015. The procedure for visits at that time, to the best of my recollection, is that a family member or attorney would come to the visitation center.  A pass would then be sent to the floor where

the inmate is located.  We would notify them of a visit and give them time to get ready.  We would then have them visit at the visitation area or on the hospital floor, depending on their mobility.  [Decl. of Deputy Lew, para. 2-4, p.1-2]

122. Deputy Lew has no recollection of these two incidents.  The only reason a visit might be cancelled is if the inmate is on discipline and not permitted visitors.  Deputy Lew did not deprive him of any visitation – he would have no reason to do so.  The movement sheets reflect various attorney visits, medical appointments, eye appointments, dental, court and regular visits.  [Decl. of Deputy Lew, para. 2, 3, 4, p.1-2]

123.  Former Sheriff Jim McDonnell was not personally aware of Mr. Voskanyan's complaints about treatment at the jail.  The population in the Los Angeles County Jail system was such that it would be impractical for me to be personally handling complaints received by inmates.  The Sheriff's Department had a grievance system in place and an appeal review process for grievances, from in mates.  [Decl. of Sheriff McDonnell, para. 2, 3, 4, p.1-2]

124.  Sheriff McDonnell had no direct knowledge of Mr. Voskanyan's complaints or alleged mistreatment. He would never condone retaliatory conduct such as that alleged by Mr.

Voskanyan.  In reviewing the

declaration of Dr. Teophilov, it

appears to be me that Mr. Voskanyan

received a lot of medical care and

attention while at the jail.

[Decl. of Sheriff McDonnell, para. 2-

4, p. 1-2]

125. Sgt. Gasataya, in July 2015, was

a Sergeant assigned to the 5000 floor

at the Men's Central Jail.  He became

alerted to the assault upon Mr.

Voskanyan when a disturbance call

was received over the radio.  [decl.

Sgt. Gasataya, para. 2, pg. 1]

126.   Sgt. Gasataya ensured that Mr.

Voskanyan was removed from the

dorm where the assault occurred so he

would be separated from any potential

suspects and taken to a clinic for

medical treatment.  At the time he

recalls that Mr. Voskanyan was very

concerned about his property and his

eyeglasses.  Sgt. Gasataya told him

that we would get his personal

property out of the dorm and returned

to him.  [Decl of Sgt. Gasataya, para.

3, page 1]

127.  The conduct of the individually

named defendants does not support

punitive damages because they acted

reasonably under the circumstances.

[Declarations of Dr. Teophilov, Nurse

Menefee, Sgt. Garcia, Deputy Haas,

Sgt. Gasataya, Lt. Mosquera, Sheriff

McDonnell, Deputy Enriquez, Deputy

Garibay, Deputy Zuniga, Deputy Lew,

Deputy Upchurch, Deputy Ines]

128.  Sgt. Garcia was not on duty at the time of the incident on July 7, 2015. [Decl. Sgt. Garcia, 1:17-21; Shift Reports, Exh D)

129. Deputy Enriquez was on light duty in the Control Booth on July 7, 2015, because he was recovering from an injury.  He was notified by the clinic that plaintiff had facial injuries.[Decl. Deputy Enriquez, para. 2, 3, 4; Shift Reports, Exh D, p.2]

.

**CONCLUSIONS OF LAW**

In addition to the foregoing factual statements, County Defendants assert the following conclusions of law.

1.      Plaintiffs' first claim alleges unusual punishment in violation of the Eighth Amendment.  (Complaint, p. 36.)  That claim fails on its face, because plaintiff was a pre-trial detainee during the entire time period at issue.  (Sep. Stmt. SUF 1.)  It is well-settled that the Eighth Amendment does not apply to pre-trial detainees.  *See, e.g., Byrd v. Maricopa County Board of Supervisors*, 845 F.3d 919, 924, n.2 (9th Cir. 2017).

2.      Claims against individual officers for failure to protect a pretrial detainee are governed by a "reckless disregard" standard.  *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016).

Under that standard, a plaintiff must prove four elements:  "(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) Those conditions put the plaintiff at substantial risk of suffering serious harm; (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the

consequences of the defendant's conduct obvious; and (4) By not taking such measures, the defendant caused the plaintiff's injuries." *Castro*, 833 F.3d at 1071.

3.      Inadequate medical care claims under § 1983 for pre-trial detainees must be "evaluated under an objective deliberate indifference standard," rather than a subjective one. *Gordon v. County of Orange*, 888 F.3d 1118 at 1125 (9th Cir. 2018) (quoting *Castro v. Cty. of Los Angeles*, 83 F.3d 1060, 1070 (9th Cir. 2016)). Under this standard, a pretrial detainee must show the following to assert a medical care claim under the due process clause of the Fourteenth Amendment: "(1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries." *Id.*.

4.      To establish a claim for allegedly inadequate medical care, a pretrial detainee must show that the defendants exhibited "deliberate indifference" to his "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

        This standard is "akin to reckless disregard." *Gordon v. County of Orange*, 888 F.3d 1118 at 1125 (9th Cir. 2018).

An inadequate medical care claims has the same elements as a failure-to-protect claim:  The plaintiff must show that "(1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries." *Id.*  (quoting *Castro*, 83 F.3d at 1070).

5.      Officials are entitled to qualified immunity, if their conduct was objectively reasonable.  Lukan v. North Forest Independent School District 183 F.3d 342, 346 (5th Cir. 1999); Harlow v. Fitzgerald (1982) 457 U.S. 800, 818, 102 S.Ct. 2727; Anderson v. Creighton 483 U.S. 635, 638-39, 107 S.Ct. 3034.  This is also expressed in the Government Code.  "Government officials performing discretionary functions enjoy qualified immunity from civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  See Government Code, Section 820.2.  See also, F.E. Trotter, Inc. v. Watkins (9th Cir. 1989) 869 F.2d 1312, 1314 (quoting Harlow v. Fitzgerald (1982) 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396).

DATED:  April 17, 2020          MONROY, AVERBUCK & GYSLER

_Jennifer E. Gysler_____
JON F. MONROY
JENNIFER E. GYSLER
Attorneys for Defendants