1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ROBERT VOSKANYAN,

Plaintiff,

v.

SHERIFF JIM MCDONNELL, et al.,

Defendants.

Case No. 2:15-CV-06259 MWF (KES)

REPORT AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE

This Report and Recommendation ("R&R") is submitted to the Honorable Michael W. Fitzgerald, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.

## INTRODUCTION

In this *pro se* civil rights action under 42 U.S.C. § 1983, Robert Voskanyan ("Plaintiff") claims that prison officials failed to protect him from assault by other inmates, subsequently failed to provide him with proper medical care, and retaliated against him for filing grievances.  Defendants now move for summary judgment. As discussed below, the motion is granted in part and denied in part.

## II.

## BACKGROUND

Plaintiff filed this action in August 2015, while he was a pretrial detainee at Los Angeles Men's Central Jail ("MCJ"), which is operated by Los Angeles County Sheriff's Department ("LASD").  (Dkt. 1 ["Complaint"].)  The Court did not screen the Complaint, but instead advised Plaintiff that if he wanted to file his case without paying the filing fee, he needed to apply to proceed *in forma pauperis* ("IFP").  (Dkt. 5.)  In September 2015, Plaintiff filed his First Amended Complaint, which after screening under the Prison Litigation Reform Act, the Court dismissed with leave to amend.  (Dkt. 7, 12.)  In June 2016, Plaintiff filed his Second Amended Complaint.  (Dkt. 22.)  After screening the Second Amended Complaint, the Court ordered service of process on 32 named Defendants in their individual capacities.  (Dkt. 23–25.)  In August 2017, Plaintiff was granted leave to file his Third Amended Complaint, which he filed in September 2017.  (Dkt. 94, 113.)  In October 2018, after the Court granted leave, Plaintiff filed his verified Fourth Amended Complaint, the operative complaint in this action.  (Dkt. 165, 166 ["4AC"].)  On October 22, 2018, Defendants answered the Fourth Amended Complaint.  (Dkt. 171 ["Answer"], 249.)

The 4AC names 32 Defendants, who are all sued in their individual capacities: (1) former Los Angeles County Sheriff Jim McDonnell, (2) MCJ Lieutenant A. Bandino, (3) MCJ Lieutenant H. Mosquera, (4) MCJ Lieutenant A. Salinas, (5) MCJ Sergeant Gasataya, (6) MCJ Sergeant R. Garcia, (7) MCJ Sergeant J. Morales, (8) MCJ Sergeant Toms, (9) MCJ Deputy F. Abril, (10) MCJ Deputy P. Borja, (11) MCJ Deputy M. Enriquez Jr., (12) MCJ Deputy J. Garibay, (13) MCJ custody assistant ("CA") D. Haas,[1] (14) MCJ Deputy A. Ines, (15) MCJ Deputy J. Lew, (16) MCJ Deputy Rodriquez, (17) MCJ Deputy J. Sanford,

---

[1] At the time of the incidents described in the 4AC, Haas was a Custody Assistant; he became a deputy in August 2019.  (Dkt. 321-3 at ¶ 1.)

(18) MCJ Deputy M. Tremble, (19) MCJ Deputy A. Zuniga, (20) MCJ Deputy C. Upchurch, (21) MCJ Chief Medical Officer N. Teophilov, (22) MCJ physician B. Felahy, (23) MCJ physician S. Little, (24) MCJ physician A. Pryor, (25) MCJ physician Y. Silvanskaya, (26) MCJ physician's assistant ("PA") K. Vivo,[2] (27) MCJ physician P. Zolnouni, (28) MCJ Nurse J. Anderson, (29) MCJ Nurse O. Luna, (30) MCJ Nurse E. Moscoso, (31) MCJ Nurse B. Menefee, and (32) MCJ Nurse C. Tutt.  (4AC at ¶¶ 4–36.)  Plaintiff alleges that Defendants failed to protect him from assault by other inmates and were deliberately indifferent to his medical needs after the assault, in violation of the Eighth and Fourteenth Amendments.  (Id. at ¶¶ 67–71.)  He further alleges that Defendants retaliated against him for filing grievances related to the assault and lack of medical care.  (Id. at ¶¶ 68, 70.)  He seeks compensatory and punitive damages.  (Id. at 38.)

The Court entered a Case Management and Scheduling Order in May 2019.  (Dkt. 238 ["CMO"].)  The CMO ordered Defendants to promptly provide Plaintiff with seven categories of documents, including medical records, investigations, and other reports concerning the assaults and failures to provide medical care alleged in the 4AC.  (Id. at 2–3.)  The CMO also set November 30, 2019, as the fact discovery cut-off date.  (Id. at 4.)  On November 25, 2019, the fact discovery cut-off date was extended to December 19, 2019.  (Dkt. 285.)

Beginning in August 2017, the parties began a lengthy dispute regarding Plaintiff's requests to produce relevant video footage from inside MCJ.  (Dkt. 185 [Court summarizing issues related to the video footage].)  In January 2018, defense counsel asserted that there is "no video surveillance camera footage available from [the relevant] time period."  (Dkt. 136.)  In March, Plaintiff received a document indicating that during the relevant time period, the surveillance cameras were "not working."  (Dkt. 139.)  Defense counsel asserted that no videos were available due

---

[2] While Plaintiff refers to Vivo as a doctor, Defendants assert that Vivo is a physician's assistant.  (Motion at 9.)

to LASD destroying responsive video footage pursuant to its one-year retention policy before it knew of Plaintiff's litigation.  (Dkt. 141 at 5–6.)  But Plaintiff produced an LASD incident report concerning the alleged assault that indicated the "closed circuit television recording was down."  (Dkt. 144 at 41.)  The Court found this evidence "inconsistent with the representation that the video footage existed but was destroyed in ordinary course."  (Dkt. 239 at 3–4.)  In June 2018, defense counsel declared that a single camera recording video footage of the alleged assault "had a Vaseline like substance on it."  (Dkt. 156, 156-1 at 2.)  The Court understood this declaration "as representing that video footage of the assault exists but is poor quality."  (Dkt. 239 at 4.)  In April 2019, defense counsel indicated that the video footage from the other five cameras in the dorm where the assault occurred had been destroyed pursuant to LASD's one-year retention policy.  (Dkt. 223, 224, 225.)  In June 2019, the Court issued an Order to Show Cause why it should not sanction Defendants for their failure to provide further updates on the video footage issues.  (Dkt. 246.)  In July and again in December 2019, Defendants confirmed that they were unable to produce any relevant video footage from inside MCJ.  (Dkt. 255, 286.)  Defendants further acknowledged that they had created a misunderstanding regarding the camera with a Vaseline-like substance on it, asserting that the "camera was inoperable due to the Vaseline, but there never was a video that was of poor quality."[3]  (Dkt. 255 at 6.)

In February 2020, Plaintiff filed a motion to serve various subpoenas on LASD, seeking information he was unable to obtain in discovery from Defendants, including documents related to the surveillance cameras.  (Dkt. 306.)  On March 17,

---

[3] As the Court first noted in March 2018, "[i]f Plaintiff develops evidence that Defendants or the Sheriff's Department were aware of a duty to preserve the disputed videos during the one-year retention period, yet destroyed them nonetheless, then Plaintiff may raise the issue of spoliation with the District Judge directly prior to trial."  (Dkt. 142 at 2.)

the Court postponed ruling on Plaintiff's requests for subpoenas, noting that after Defendants file their motion for summary judgment, "the Court will determine whether the information sought by Plaintiff in his proposed subpoenas would be useful in opposing Defendants' motion."[4]  (Dkt. 310 at 10.)

On April 17, 2020, Defendants filed a Motion for Summary Judgment ("Motion"), along with a memorandum of points and authorities, a statement of uncontroverted facts and conclusions of law, declarations from Defendants Enriquez, Haas, Ines, Upchurch, Mosquera, Gasataya, Lew, Menefee, McDonnell, Garibay, Garcia, and Teophilov, and various MCJ records.  (Dkt. 321, 324.) Despite being given multiple extensions, Plaintiff has not filed an opposition to the Motion.  (Dkt. 327–333, 336.)

On December 29, 2020, Plaintiff filed another request for extension of time (Dkt. 337.)  While the Court appreciates that Plaintiff has faced many obstacles in responding to the Motion, including COVID and his present homeless status, this case is now more than five years old.  Therefore, in the interests of securing a just and speedy determination of this action, Plaintiff's request for more time is denied,[5] and the Court will proceed to ruling on Defendant's Motion.  Fed. R. Civ. P. 1.

## III.

## LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

---

[4] Given that Defendants' motion for summary judgment is largely denied, as discussed below, Plaintiff's motion to serve subpoenas on LASD is denied without prejudice.

[5] The denial is without prejudice to Plaintiff arguing in opposition to any objections raised by Defendants to this Report and Recommendation.

a matter of law." Fed. R. Civ. P. 56(a).  The movant's "burden is not a light one." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).  Inferences drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  Tolan v. Cotton, 572 U.S. 650, 651 (2014) (per curiam) ("in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor") (citation omitted).  The moving party, however, need not disprove the opposing party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Rather, if the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there exists a genuine issue for trial.  Id. at 323–24; Fed. R. Civ. P. 56(c)(1).  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party.  Id. at 250–51.  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury … could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict …."  Id. at 252.  "The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial."  MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 516 (9th Cir. 1993).  If there is a factual dispute, the court must accept the nonmovant's version of what occurred and must draw all reasonable inferences in his favor.  Anderson, 477 U.S. at 255.

Even if the nonmovant fails to oppose the motion, summary judgment cannot be granted by "default."  Fed. R. Civ. P. 56(e) advisory committee's 2010 note ("summary judgment cannot be granted by default even if there is a complete failure to respond to the motion").  Thus, "a motion for summary judgment may not be granted based on a failure to file an opposition to the motion, regardless of any local rule that suggests the contrary."  Heinemann v. Satterberg, 731 F.3d 914, 916 (9th Cir. 2013); see Cristobal v. Siegel, 26 F.3d 1488, 1494–95 & n.4 (9th Cir. 1994) (rejecting the argument that "failure to respond to a motion for summary judgment might justify granting the motion").  Instead, "[b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed."  Jackson v. Fed. Exp., 766 F.3d 189, 194 (2d Cir. 2014); see White by White v. Pierce Cty., 797 F.2d 812, 815 (9th Cir. 1986) ("Even in the absence of opposing affidavits, summary judgment is inappropriate where the movant's papers are insufficient on their face."); see Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1029 (9th Cir. 2001) (unopposed MSJ may not be granted if the movant's papers on their face reveal a genuine issue of material fact).  Therefore, before granting summary judgment against a *pro se* litigant, the court should examine the record *sua sponte*.  Fed. R. Civ. P. 56(e)(4) advisory committee's 2010 note ("the court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant"); Fed. R. Civ. P. 56(c)(3) ("The court … may consider other materials in the record.").

A verified complaint or prior motion signed under penalty of perjury may be considered an affidavit in opposition to a motion for summary judgment to the extent that it sets forth facts within the plaintiff's personal knowledge that are admissible into evidence.  See Moran v. Selig, 447 F.3d 748, 759 n.16 (9th Cir. 2006); Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995); see also Jones v.

1  Blanas, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause [the plaintiff] is pro se, we

2  must consider as evidence in his opposition to summary judgment all of [the

3  plaintiff's] contentions offered in motions and pleadings, where such contentions

4  are based on personal knowledge and set forth facts that would be admissible in

5  evidence, and where [the plaintiff] attested under penalty of perjury that the

6  contents of the motions or pleadings are true and correct.").  Nevertheless, the court

7  may also consider a plaintiff's admissions against interest in a complaint, because

8  "[f]actual assertions in pleadings … are considered judicial admissions conclusively

9  binding on the party who made them."  Am. Title Ins. Co. v. Lacelaw Corp., 861

10  F.2d 224, 226 (9th Cir. 1988).

11  **IV.**

12  **SUMMARY OF FACTUAL ALLEGATIONS**

13  In June 2015, Plaintiff was arrested and detained on MCJ's 5600 Floor.[6]

14  (4AC at ¶ 40.)  The 5600 Floor includes an Observation Booth and cameras where

15  correctional officers can monitor the dorm.[7]  (Id.)  On July 7, 2015, Plaintiff was

---

16  [6] The following factual allegations are taken from Plaintiff's verified 4AC

17  (see 4AC at 38) and are limited to factual contentions allegedly based on Plaintiff's

18  personal knowledge.  See Moran, 447 F.3d at 759 n.16.  The Court also takes

19  judicial notice of the records from Plaintiff's criminal trial in Los Angeles County
    Superior Court case no. PA083749-01, including the Clerk's Transcript ("CT") and
    Reporter's Transcript ("RT") which were lodged in Voskanyan v. Lizarraga, No.

20  18-8251 (C.D. Cal. Apr. 15, 2019) (Dkt. 19: notice of lodging).  See DeGroot v.

21  United States, 786 F. App'x 638, 642 (9th Cir. 2019) (in a civil rights case, taking
    judicial notice of trial transcripts from criminal case) (citing Fed. R. Evid. 201); see

22  also United States v. Raygoza-Garcia, 902 F.3d 994, 1001 (9th Cir. 2018) ("A court

23  may take judicial notice of undisputed matters of public record, which may include
    court records available through PACER.").

24
    [7] As discussed supra § II, Defendants acknowledged that the 5600 Floor

25  includes multiple cameras but asserted that any relevant video footage was

26  destroyed pursuant to LASD's one-year retention policy.  The Court has left open
    the issue of spoliation if Plaintiff develops evidence that Defendants or LASD were

27  aware of a duty to preserve the disputed videos during the one-year retention

28  period, yet destroyed them nonetheless.  (Dkt. 142 at 2.)

assaulted by 30 to 40 inmates who knocked him unconscious.  (Id. at ¶¶ 41–42.)
The two officers assigned to the Observation Booth, Deputies Ines and Enriquez,
observed the assault while laughing and neither intervened nor summoned
assistance.  (Id. at ¶ 41 ["the two (2) Deputy Sheriffs … watched as I was
assaulted … and laughed"].)  After the assault, Sergeant Garcia failed to seek
medical assistance.  (Id.)  Plaintiff's brother, who was also detained at MCJ,
dragged Plaintiff to the shower, washed away the blood, and changed Plaintiff's
bloody clothes.  (Id. at ¶ 42.)

Plaintiff took himself to the MCJ clinic, complaining of a bloody nose and
swollen face.  (Id. at ¶ 43.)  He was transferred by wheelchair to Twin Towers
urgent care, where he was seen by PA Vivo.  (Id. at ¶¶ 43–44.)  Plaintiff was losing
consciousness, fainting from severe pain in his left shoulder, left hip, and left ribs.
(Id. at ¶ 44.)  He also had severe stomach pain with rectal bleeding.  (Id.)  Despite
Plaintiff's pain complaints, PA Vivo cleared Plaintiff to return to the MCJ clinic,
laughing that Plaintiff "came from ring UFC fight."  (Id.)  After he was taken back
to the MCJ clinic by Deputy Garibay, Plaintiff was left alone for eight hours in the
wheelchair, bleeding.  (Id. at ¶ 45.)  Thereafter, instead of taking Plaintiff to the
hospital, he was "hidden" by Sergeant Gasataya in Cell B-21 on 3500 Floor and
assigned a top bunk despite being in a wheelchair.  (Id. at ¶ 46.)  Two days later,
Plaintiff met with his criminal trial attorney and informed him of the assault.  (CT
5–6.)

Cell B-21 had no functioning toilet and there was water containing feces on
the floor.  (4AC at ¶ 46.)  Plaintiff had difficulty seeing due to his bruised face and
eyes and he could not move around because of damage to his ribs, hip, and
shoulder.  (Id.)  Because of damage to Plaintiff's jaw and his broken teeth, Plaintiff
was in constant pain and could not eat.  (Id.).  For over a week, Deputies Upchurch
and Borja and CA Haas regularly refused to take him to the clinic or to seek
medical assistance.  (Id.)  On July 16, Deputy Cortez found Plaintiff unresponsive

on the cell floor and took him to the MCJ clinic.  (Id. at ¶ 48.)  Although Plaintiff had trouble ambulating without falling down, Nurse Moscoso took away Plaintiff's wheelchair and gave him a walker.  (Id. at ¶ 49.)

On July 18, Plaintiff again collapsed in his cell and was taken to the clinic by Nurse Bhanji.  (Id.)  Plaintiff's face was swollen with two black eyes and he complained of a bloody nose, cold sweats, blurry vision, vomiting, and difficulty ambulating.  (Id.)  On July 20, Plaintiff presented with a swollen face and black eyes and reported chronic fainting episodes.  (Id. at ¶ 50.)  Dr. Zolnouni refused to examine Plaintiff, stating that Plaintiff was "okay" and did not "have a problem." (Id.)  On July 24, Plaintiff passed out from his injuries and was taken to the hospital by Deputy Cater.  (Id. at ¶ 51.)

On August 2, Plaintiff was still suffering from his injuries and was bleeding from his nose.  (Id. at ¶ 53.)  On August 11, Nurse Luna refused to allow Plaintiff to see the orthopedic physician, even though Plaintiff had an appointment.  (Id.)  On August 14, Plaintiff was seen by an eye doctor for his chronic vision issues stemming from the assault.  (Id.).  After examining Plaintiff's swollen face, bloody nose, and bruised eyes, the eye doctor "immediately" referred Plaintiff to Twin Towers urgent care.  (Id.)  On that same day, the superior court judge learned from MCJ that Plaintiff needed a wheelchair to ambulate for at least the next 30 days. (CT 6.)  On August 16, Deputy Zuniga left Plaintiff in a hot, steaming shower with no ability to control the water until Plaintiff passed out from the heat.  (4AC at ¶ 53.)  On August 27, Plaintiff informed the superior court judge that he was still "suffering with multiple fractures" from the assault.  (CT 6.)  On August 31, Plaintiff fainted after a court hearing and was taken to Olive View Hospital where the doctors told Plaintiff that he has "serious injuries and multiple fractures in [his]

face."[8]  (4AC at ¶ 54.)  After his return to MCJ, Plaintiff was denied access to medical care.  (Id. at ¶ 55.)

On September 22, Lieutenant Mosquera refused Plaintiff's request to see a doctor and instead transferred him to solitary confinement.  (Id.)  On September 24, Plaintiff was taken to the hospital by ambulance after blacking out.  (Id.)  He blacked out again on September 27, but jail personnel refused to provide him with medical attention.  (Id.)  On October 1, Plaintiff's pain medication was discontinued by Dr. Felahy.  (Id. at ¶ 56.)  In a verified motion dated October 6, Plaintiff informed the superior court that he needs a wheelchair to ambulate and has multiple fractures on his face and ribs and muscle damage to his lower hip and left shoulder. (CT 92.)  Dr. Teophilov informed the superior court that Plaintiff "does not have a medical necessity for a wheelchair, only for transportation to court."  (CT 91, 96.) On October 7, Dr. Felahy again denied Plaintiff any treatment or medication.  (4AC at ¶ 56.)  On November 13, Plaintiff informed the superior court, in a verified statement, that he was waiting to get physical therapy and surgeries for his broken nose and teeth, fractures to his face and ribs, dislocated shoulder, and lower hip nerve damage.  (CT 101.)  On November 18, Plaintiff began a hunger strike to protest the lack of medical care.  (4AC at ¶ 57.)  On November 23, Dr. Felahy again denied Plaintiff any medical care.  (Id.)  On November 25, Plaintiff fainted from starvation and severe pain and was taken by ambulance to the hospital.  (Id.)  On December 1, Dr. Gevorkian ordered an MRI, prescribed physical therapy, and restarted Plaintiff on multiple medications.  (Id. at ¶ 58.)  On December 9, Dr. Felahy discontinued Plaintiff's religious diet.  (Id.)  In January 2016, Dr. Pryor visited Plaintiff in his cell and discounted his injuries as "old and healed."  (Id. at

---

[8] This incident may have actually occurred on September 8.  (See RT 304–05) (superior court transcript for September 8 indicates a "medical issue" with Plaintiff, necessitating paramedics being summoned and continuing Plaintiff's criminal proceeding until the next day).

¶ 59.)  In June 2016, a neurologist prescribed additional medications and ordered physical therapy.  (Id. at ¶ 64.)  Nevertheless, Nurse Tutt refused to give Plaintiff his medications.[9]  (Id.)

In the meantime, in retaliation for Plaintiff filing multiple grievances concerning the assault and subsequent lack of medical care, Deputy Abril and others denied Plaintiff access to religious services, roof time, day room, and daily hygiene and refused his requests to see a doctor.  (Id. at ¶¶ 56–59.)  Deputies Rodriguez and Tremble refused to allow Plaintiff to attend a court date.  (Id. at ¶ 60.)  Deputy Lew denied visitor access to Plaintiff's fiancé, family, and attorney. (Id. at ¶ 62.)  Deputy Rodriguez denied Plaintiff access to phone calls, the day room, the yard, and the showers.  (Id. at ¶ 63.)  On December 21, 2015, Deputy Abril and Lieutenant Mosquera removed Plaintiff's wheelchair without medical authority.  (Id. at ¶ 58.)  On January 8, 2016, Dr. Teophilov reinstated use of the wheelchair but left him handcuffed to a gurney in the Twin Towers clinic for a week.  (Id. at ¶ 59.)  On April 21, Nurse Tutt refused his request to see a doctor for severe pain in his left shoulder and left hip.  (Id. at ¶ 62.)  On May 18, after his wisdom tooth was extracted, Deputies Rodriguez and Tremble hit and punched Plaintiff in face, chest, and stomach after Plaintiff stated he was too weak to walk and then falsely accused Plaintiff of assaulting them.  (Id. at ¶ 63.)  Later that

_____

[9] On January 7, 2016, Plaintiff's trial counsel opined that Plaintiff was not mentally competent to stand for trial.  (RT 1802–04; CT 106.)  Counsel reported that the last few times he had met with Plaintiff at MCJ, "he was in a straight [*sic*] jacket, he was in one of those suicide watch jackets. … He had urinated and defecated on himself.  He was disheveled and [counsel] couldn't hear his statements and other things."  (RT 1802.)  The trial court suspended the case until experts had a chance to examine Plaintiff and report their findings.  (RT 1803; CT 106–07.)  On February 29, 2016, the superior court held a competency hearing and found Plaintiff mentally competent to stand trial.  (CT 110–11.)  On September 2, 2016, Plaintiff "freely and voluntarily" entered into a plea agreement, asserting that he was not "suffering from any medical condition[ ] that is or may be impairing [his] ability to enter into [the] plea agreement."  (CT 129.)

1  month, Deputy Rodriguez denied Plaintiff access to the shower for two months.

2  (Id.)  On May 26, Deputy Tremble threatened Plaintiff that he would "die in this

3  cell."  (Id.)  On May 31, Deputies Tremble and Rodriguez denied Plaintiff his

4  phone privileges and threw away all of his personal property.  (Id.)  On June 1,

5  Sergeant Toms refused to take Plaintiff to the clinic unless he signed a blank form.

6  (Id. at ¶ 64.)  On August 17, Nurse Menefee filed a complaint against Plaintiff,

7  falsely claiming that Plaintiff was refusing physical therapy treatment.  (Id. at ¶ 65.)

8  On August 31, Sergeant Garcia refused to take Plaintiff to his physical therapy

9  appointment.  (Id.)  During the relevant time period, Plaintiff informed Sheriff

10  McDonnell in multiple letters and phone calls that he was being mistreated by the

11  other Defendants.  (Id. at ¶ 66.)

## V.

## EVIDENTIARY ISSUES

14        Rule 56 requires the parties to set out facts they will be able to prove at trial.

15  Fed. R. Civ. P. 56(c)(2).  "While the evidence presented at the summary judgment

16  stage does not yet need to be in a form that would be admissible at trial, the

17  proponent must set out facts that it will be able to prove through admissible

18  evidence."  Norse v. City of Santa Cruz, 629 F.3d 966, 973 (9th Cir. 2010) (citing

19  Celotex Corp., 477 U.S. at 324); see Fed. R. Civ. P. 56(c)(4) ("An affidavit or

20  declaration used to support or oppose a motion must be made on personal

21  knowledge, set out facts that would be admissible in evidence, and show that the

22  affiant or declarant is competent to testify on the matters stated."); accord C.D. Cal.

23  L.R. 7-7 ("Declarations shall contain only factual, evidentiary matter and shall

24  conform as far as possible to the requirements of F.R.Civ.P. 56(c)(4).").  It is *not*

25  enough for the declarant simply to state that he or she has personal knowledge of

26  the facts stated.  Rather, the declaration itself must contain facts showing the

27  declarant's connection with the matters stated therein, establishing the source of his

28  or her information.  Fed. R. Evid. 602 ("A witness may testify to a matter only if

1  evidence is introduced sufficient to support a finding that the witness has personal

2  knowledge of the matter.").

3  Documents obtained in discovery may not be considered unless authenticated

4  by appropriate affidavit or declaration.  Orr v. Bank of Am., NT & SA, 285 F.3d

5  764, 777 (9th Cir. 2002); see Hal Roach Studios, Inc. v. Richard Feiner & Co., 896

6  F.2d 1542, 1550 (9th Cir. 1989) ("It is well established that unauthenticated

7  documents cannot be considered on a motion for summary judgment.").  To be

8  considered by the court, "documents must be authenticated by and attached to an

9  affidavit that meets the requirements of [Rule 56(c)(4)] and the affiant must be a

10  person through whom the exhibits could be admitted into evidence."  Canada v.

11  Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987) (citation omitted).

12  Thus, a "writing is not authenticated simply by attaching it to an affidavit."  Beyene

13  v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1182 (9th Cir. 1988) (citation

14  omitted).  Further, declarations by attorneys are sufficient only if the facts stated are

15  matters of which the *attorney* has knowledge—e.g., matters occurring during the

16  course of the lawsuit, such as the authenticity of a deposition transcript.  See Orr,

17  285 F.3d at 778; Mendonca v. Caliber Home Loans, Inc., No. CV 14-02384 BRO

18  AJWX, 2015 WL 1566847, at *3, 2015 U.S. Dist. LEXIS 49420, at *7–8 (C.D. Cal.

19  Apr. 6, 2015); Estremera v. United States, 442 F.3d 580, 584 (7th Cir. 2006);

20  Brainard v. Am. Skandia Life Assur. Corp., 432 F.3d 655, 667 (6th Cir. 2005).

21  **A.**     **Documentary Evidence Has Not Been Properly Authenticated.**

22  Defendants attach almost 700 pages of "business records" in support of their

23  Motion.  (Dkt. 321-14–321-21, 324.)  But none of the records were properly

24  authenticated.  A hearsay exception exists for records of a regularly conducted

25  activity if:

26  **(A)** the record was made at or near the time by—or from information

27  transmitted by—someone with knowledge;

28

14

**(B)** the record was kept in the course of a regularly conducted activity

of a business, organization, occupation, or calling, whether or not for

profit; [and]

**(C)** making the record was a regular practice of that activity.

Fed. R. Evid. 803(6)(A)–(C).  The foundation for these conditions must be "shown

by the testimony of the custodian or another qualified witness."  Fed. R. Evid.

803(6)(D).  "The witnesses or persons certifying the records need not have any

knowledge of the record itself or the events it describes; they need only provide the

bare bones information required by subsections (A) through (C)."  30 Fed. Prac. &

Proc. Evid. § 6631 (2d ed.).  Instead, "[a]ll that is required is that the testifying

witness be familiar with the record keeping system of which the proffered

document is a part."  30B Fed. Prac. & Proc. Evid. § 6863 (2020 ed.) (citation

omitted); see U.S. Commodity Futures Trading Comm'n v. Dizona, 594 F.3d 408,

416 (5th Cir. 2010) (finding exhibits not properly admitted under Rule 803(6)

because government witness "was not a qualified witness who could explain [the]

record keeping system and vouch that the requirements of the rule had been met").

"Consequently, the typical witness is someone with an intimate familiarity with the

organization's record keeping."  Id.

Here, Defendants' counsel contends that the records attached to the Motion

are "kept in the normal course of business."  (Dkt. 321 at 25–26 ["Gysler Decl."]

¶¶ 3–11.)  But declarations by outside counsel are not sufficient to provide the

foundation required by Rule 803(6).  Orr, 285 F.3d at 778; Mendonca, 2015 WL

1566847, at *3, 2015 U.S. Dist. LEXIS 49420, at *7–8.  Gysler has not

demonstrated that she is familiar with MCJ's record keeping system and can vouch

that the requirements of Rule 803(6)(A)–(C) have been met.

Gysler also asserts that certain medical records were authenticated by Dr.

Teophilov.  (Gysler Decl. ¶¶ 8–9.)  But Dr. Teophilov did not testify to the

*authenticity* of the medical records; instead, he merely attested that he had

15

1   "reviewed" medical records provided to him.  (Dkt. 321–13 ["Teophilov Decl."]

2   ¶¶ 1–3.)  Nor did he assert facts demonstrating his familiarity with the medical

3   record keeping system or vouch that the requirements of Rule 803(6)(A)–(C) have

4   been met.

5          Therefore, because the records have not been properly authenticated, the

6   Court declines to consider them in support of Defendants' Motion.  Fed. R. Evid.

7   803(6).  Further, even if the records were properly authenticated, there are genuine

8   issues of material facts precluding summary judgment, as discussed below.

9   **B.      Declarations Include Statements Not Based On Personal Knowledge.**

10         Defendants include 11 declarations in support of their Motion.  (Dkt. 321-2–

11  321-13.)  However, many of the declarations include statements that are not based

12  on personal knowledge, include inadmissible hearsay or opinions, or fail to

13  establish the declarant is competent to testify to the matters stated.  Fed. R. Civ. P.

14  56(c)(4).  Further, statements such as "I would and could competently testify to the

15  following facts which are within my personal knowledge" alone are not sufficient

16  to establish personal knowledge and competency.  Instead, personal knowledge and

17  competency must be demonstrated by the specific facts asserted.  See, e.g., Bank

18  Melli Iran v. Pahlavi, 58 F.3d 1406, 1412 (9th Cir. 1995) (declarations "on

19  information and belief" entitled to no weight where declarant lacks personal

20  knowledge).  Declarants' assertions that their interactions with Plaintiff "were

21  within policy" are inadmissible opinions.  Finally, many of the declarants have no

22  specific memory of the incidents alleged in the 4AC; instead, each declarant merely

23  speculates what he or she *would generally* do under the circumstances alleged by

24  Plaintiff, which fails to demonstrate a foundation in personal knowledge.  See John

25  M. Floyd & Assocs., Inc. v. TAPCO Credit Union, 550 F. App'x 359, 360 (9th Cir.

26  2013) ("The Floyd declaration, upon which plaintiff largely relies to establish a

27  genuine issue of material fact, sets out mere speculation for the critical facts,

28  without a showing of foundation in personal knowledge, for the facts claimed to be

at issue.").  In any event, the speculations are contradicted by Plaintiff's factual allegations, and thus fail to create uncontroverted facts for summary judgment purposes.

Defendants' declarations also include the following deficiencies:

**1.    Declaration of Deputy Enriquez, Jr.**

Enriquez is not competent to conclude that all his interactions with Plaintiff "were within policy" or to speculate whether Enriquez would "witness an assault by 30 to 40 inmates and fail to intervene."  (Dkt. 321-2 at ¶ 4.)

**2.    Declaration of Deputy David J. Haas.**

Haas has no recollections of the incidents alleged in the 4AC.  His speculation about what he would have done under the circumstances alleged by Plaintiff (Dkt. 321-3 at ¶¶ 3, 5) fails to demonstrate a foundation in personal knowledge.  Further, his "understanding that the medical records for Mr. Voskanyan reflect …" (Dkt. 321-3 at ¶ 4) is inadmissible hearsay.

**3.    Declaration of Deputy Adrian Ines.**

Ines's speculation about what would have occurred if "there had been [an] assault involving 30 to 40 inmates" (Dkt. 321-4 at ¶ 4) fails to demonstrate a foundation in personal knowledge.

**4.    Declaration of Deputy Charlie Upchurch.**

Upchurch's speculation about what would have occurred under circumstances alleged by Plaintiff (Dkt. 321-5 at ¶¶ 3–4) fails to show a foundation in personal knowledge.  Upchurch's "understanding" of information contained in medical records (id. ¶ 5) is inadmissible hearsay.

**5.    Declaration of Lieutenant Hugo Mosquera.**

Mosquera has no recollections of the incidents alleged in the 4AC.  His "understanding" and "awareness" about what occurred and his speculation that he "would not tolerate the type of behavior claimed by Plaintiff" (Dkt. 321-6) fail to demonstrate a foundation in personal knowledge.

17

### 6.  Declaration of Sergeant Gabino Gasataya.

Gasataya fails to demonstrate the requisite foundation for authenticating "the incident report."[10]  (Dkt. 321-7 at ¶ 4.)  His reference to the report also does not demonstrate personal knowledge.

### 7.  Declaration of Deputy Jarrett M. Lew.

Lew's review of Plaintiff's "movement history" (Dkt. 321-8 at ¶ 2) is inadmissible hearsay.  Lew has "no recollection" of two incidents alleged by Plaintiff.  (Id. ¶¶ 3–4).  His speculation about what may have occurred (id. ¶ 4) does not demonstrate personal knowledge.

### 8.  Declaration of Bobbie Menefee, R.N..

While Menefee indicates that she reviewed medical documents, she does not assert that such records refreshed her recollection of the incidents referred to therein.  (Dkt. 321-9 at ¶ 1.)  Thus, her reference to these records is inadmissible hearsay.  Further, her speculation that she "would never do such a thing" (id. ¶ 2) does not demonstrate personal knowledge.

### 9.  Declaration of Deputy Garibay.

While Garibay indicates that he reviewed an incident report, he does not assert that the incident report refreshed his recollection of the incident referred to therein.  (Dkt. 321-10 at ¶ 2.)  Thus, his reference to this report is inadmissible hearsay.

### 10.  Declaration of Sergeant Roberto Garcia.

While Garcia indicates that he reviewed an incident report, he does not assert that the incident report refreshed his recollection of the incident referred to therein. (Dkt. 321-12 at ¶ 2.)  Thus, his reference to this report is inadmissible hearsay.

---

[10] While Gasatya asserts that the incident report is attached, it was not and it is not clear to which incident report he is referring.

11. **Declaration of Nickolay Teophilov, M.D.**

a. Percipient Statements.

"A treating physician does not need to be certified as an expert witness and may testify as a lay witness if he or she testifies about observations based on personal knowledge, including the treatment of the party." Walker v. Spina, No. CV 17-0991, 2019 WL 145626, at *19, 2019 U.S. Dist. LEXIS 4018, at *61 (D.N.M. Jan. 9, 2019) (citation omitted); see Hoffman v. Lee, 474 F. App'x 503, 505 (9th Cir. 2012) (a district court properly admits the testimony of a party's treating medical provider, even if the party has not disclosed the provider as an expert witness, so long as each of the treating medical provider's opinions "addressed his thoughts on particular actions that he took in his treatment of [the party]"). Here, it appears that Dr. Teophilov examined Plaintiff on only one instance, on January 9, 2016. (Dkt. 321-13 at ¶ 81.)

b. Expert Statements.

While Dr. Teophilov asserts that he "personally participated in the delivery of health care services to [Plaintiff]" (Dkt. 321-13 at ¶ 2), most of his statements are his summary of the medical record and opinions based on that review (id. at 1 & ¶¶ 2–3, 95–97).

However, Defendants have not laid a proper foundation establishing Dr. Teophilov to testify as an expert. See 29 Fed. Prac. & Proc. Evid. § 6264.3 (2d ed.) ("the party proffering a witness as an expert has the burden of laying a foundation that establishes the witness is qualified"); see also Fed. R. Civ. P. 56(c)(4). Dr. Teophilov's opinions are conclusory, and thus are of little persuasive value; he lumps multiple doctors and nurses into single opinions and does not describe the particular facts he relied on to reach his opinion as to each individual Defendant. See Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993) ("an expert opinion must be more than a conclusory assertion about ultimate legal issues"); accord Sahakian v. City of Glendale, No. CV 05-7419 FMO, 2008 WL 11411713,

19

at *8, 2008 U.S. Dist. LEXIS 142174, at *21–22 (C.D. Cal. Jan. 7, 2008); <u>see generally</u> <u>Hartwell v. Danek Med., Inc.</u>, 47 F. Supp. 2d 703, 709–10 (W.D. Va. 1999) ("Where an expert's opinion merely cites a 'cause and effect' relationship, without supporting medical data which can eliminate other causes, it is merely a conclusory opinion.").  Dr. Teophilov does not describe the methodologies that he used to arrive at his opinions.  Instead, he merely summarizes the medical records that he reviewed (Dkt. 321-13 at ¶¶ 2–94) and then summarily opines that the medical treatment provided by Drs. Felahy, Silvanskaya, Pryor, Little, Zolnouni, and Vivo, and Nurses Anderson, Tutt, Menefee, and Luna were "well within the standard of care" (<u>id.</u> at ¶¶ 95–97). Further, as discussed above, Defendants did not properly authenticate the medical records relied on by Dr. Teophilov for his opinions.[11]

### 12. Summary.

The Court strikes those portions of Defendants' declarations which are not based on personal knowledge, include inadmissible hearsay or opinions, or fail to establish the declarant is competent to testify to the matters stated.  Fed. R. Civ. P. 56(c)(4).

## VI.

## DISCUSSION

Plaintiff alleges that Defendants' actions violated both his Eighth and Fourteenth Amendment rights.  (4AC at ¶¶ 68–71.)  When Plaintiff was assaulted

---

[11] The Court's CMO did not set a deadline for the disclosure of expert witnesses and no trial date has been set.  Nevertheless, if a party fails to identify a witness who will present expert evidence, "the party is not allowed to use that information or witness to supply evidence on a [summary judgment] motion."  Fed. R. Civ. P. 37(c)(1); <u>see</u> Fed. R. Civ. P. 26(a)(2); Fed. R. Evid. 702.  Further, the Court would not grant summary judgment based on an expert opinion without allowing the opposing party an opportunity to examine the expert and submit an opposing opinion.

by other inmates in July 2015, he was a pretrial detainee.  (4AC at ¶ 40; Dkt. 321-1
[Defendants' Statement of Uncontroverted Facts ("SUF")] No. 1).  The Eighth
Amendment, however, precludes cruel and unusual *punishment*.  U.S. Const.
amend. VIII.  Because "pretrial detainees have not yet been convicted of a crime
and therefore are not subject to punishment by the state, … their rights arise under
the Fourteenth Amendment's Due Process Clause."  Sandoval v. Cty. of San Diego,
—F.3d—, No. 18-55289, 2021 WL 116539, at *6, 2021 U.S. App. LEXIS 866, at
*19 (9th Cir. Jan. 13, 2021).  Thus, the Court will construe Plaintiff's failure-to-
protect and deliberate indifference claims as arising under the Fourteenth
Amendment's Due Process Clause.

A.      **Failure-To-Protect Claim.**

Pretrial detainees "who sue prison officials for injuries suffered while in
custody may do so under … the Fourteenth Amendment's Due Process Clause."
Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1067–68 (9th Cir. 2016) (en banc).
"Because pretrial detainees retain at least those constitutional rights that we have
held are enjoyed by convicted prisoners, [courts] have sometimes looked to the
Eighth Amendment as a starting point for determining the rights of pretrial
detainees under the Fourteenth Amendment."  Sandoval, 2021 WL 116539, at *7,
2021 U.S. App. LEXIS 866, at *19 (citation omitted).  In Kingsley v. Hendrickson,
576 U.S. 389 (2015), however, the Supreme Court held that the Eighth and
Fourteenth Amendment standards are not the same.  Id. at 400.  Instead, the Court
concluded that for Fourteenth Amendment claims, the relevant standard is not
whether the defendant acted in good faith, but instead whether the defendant's
actions were "objectively reasonable."  Id. at 396–97; see Horton by Horton v. City
of Santa Maria, 915 F.3d 592, 602 (9th Cir. 2019) ("Fourteenth Amendment
failure-to-protect claims must be analyzed under a *purely* objective standard.").
Under Castro, the court asks whether there was "a substantial risk of serious harm
to the plaintiff that could have been eliminated through reasonable and available

measures that the officer did not take, thus causing the injury that the plaintiff suffered."  833 F.3d at 1070.  Thus, "the elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

Id. at 1071.

Construing the facts in the light most favorable to Plaintiff, the nonmoving party, there are genuine issues of material fact as to some Defendants' liability on the failure-to-protect claim.  Plaintiff attests in his verified 4AC that beginning in June 2015, he was housed on the MCJ 5600 Floor, which includes an observation booth and multiple cameras where jail officers can monitor the entire floor.  (4AC at ¶ 40.)  On July 7, 2015, Plaintiff was assaulted by 30 to 40 inmates who knocked him unconscious.  (Id. at ¶¶ 41–42.)  The two officers assigned to the observation booth, Deputies Ines and Enriquez, observed the assault while laughing and neither intervened nor summoned assistance.  (Id. at ¶ 41.)  After the assault, Sergeant Garcia failed to seek medical assistance.  (Id.)  Instead, Plaintiff's brother, who was also detained at MCJ, dragged Plaintiff to the shower, washed away the blood, and changed Plaintiff's bloody clothes.  (Id. at ¶ 42.)  Thereafter, Plaintiff took himself to the MCJ clinic, complaining of a bloody nose and a swollen face.  (Id. at ¶ 43.)  Under these circumstances, a reasonable jury could determine that Defendants Ines,

Enriquez, and Garcia (the "Failure-to-Protect Defendants") observed Plaintiff being assaulted in a manner that put Plaintiff at substantial risk of serious harm, failed to take reasonable steps to personally intervene or seek prompt assistance, and did not summon medical assistance after the assault.  See Gibbs v. Anderson, No. CV1907455RGKPLA, 2020 WL 7978405, at *11, 2020 U.S. Dist. LEXIS 247099, at *36 (C.D. Cal. Nov. 9, 2020) ("Plaintiff's factual allegations concerning the actions taken by Officer Castillo before the attack, the manner in which plaintiff was attacked, the lack of any action taken by any prison official during the attack while plaintiff remained conscious, and the fact that he was handcuffed while unconscious (rather than being provided with medical attention)" sufficiently allege a failure-to-protect claim.").  A jury could further conclude that Failure-to-Protect Defendants' actions caused Plaintiff's injuries.

Failure-to-Protect Defendants assert that they did not observe Plaintiff being assaulted (SUF No. 9), but this evidence is controverted by Plaintiff's sworn statements.  Sergeant Gasataya does not dispute that the Floor 5600 cameras were working the day of the assault.  (Dkt. 321-7 at ¶ 6.)  Instead, he asserts that "a film had been placed on the camera to obscure any footage."  (Id.)  Presumably the officers in the observation booth would know that at least one of their surveillance cameras was inoperable, and their failure to have the film promptly removed is circumstantial evidence of an intentional decision to put inmates, including Plaintiff, at substantial risk of suffering serious harm.[12]  Failure-to-Protect Defendants also contend that other deputies and sergeants responded to the assault and promptly took Plaintiff to the clinic.  (SUF No. 10.)  They, however, do not cite any evidence to support this statement.  To the extent that they intend to rely on the unauthenticated incident report, the incident report indicates that Deputy Ines took

---

[12] As noted supra § II, Defendants have made a number of confusing, and sometimes contradictory, statements about the existence and retention of relevant video footage.

Plaintiff's *brother* to the clinic and that Sergeant Garcia escorted Plaintiff *from* the MCJ clinic.  (Dkt. 321-16 at 4.)  Finally, Failure-to-Protect Defendants assert that Plaintiff told deputies only five to seven inmates assaulted him.  (SUF No. 8.)  But this statement was allegedly made by Plaintiff's *brother* not Plaintiff.  (Dkt. 321-16 at 4.)  Even if Plaintiff allegedly told medical staff that he was assaulted by only four inmates (SUF No. 8; Dkt. 321-17 at 242), this apparent discrepancy is immaterial to Plaintiff's failure-to-protect claim.  Whether Plaintiff was assaulted by four or forty inmates, Failure-to-Protect Defendants had a duty to take reasonable steps to abate the substantial risk of Plaintiff suffering serious harm.

In sum, viewing the evidence in the light most favorable to Plaintiff, there are triable issues of fact on the failure-to-protect claim.

**B.    Objective Deliberate Indifference.**

"[C]laims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard."  Gordon v. Cty. of Orange, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (citation omitted).  The "elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (ii) those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

Id. at 1125.  "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn on the facts and circumstances of each particular case.'"  Castro, 833 F.3d at 1071 (quoting Kingsley, 576 U.S. at 397 (other citation omitted)).  The "mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment."  Id. (citation omitted).  Thus, the plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard."[13]  Id.; accord Gordon, 888 F.3d at 1125.

Construing the facts in the light most favorable to Plaintiff, the nonmoving party, there are genuine issues of material fact as to some Defendants' liability on the objective deliberate indifference claim.  Plaintiff attests in his verified 4AC that after the assault and despite losing consciousness and fainting from severe pain and rectal bleeding, PA Vivo released Plaintiff from Twin Towers urgent care, laughing that Plaintiff looks like he "came from [a] ring UFC fight."  (4AC at ¶¶ 43–44.)  After he was taken back to the MCJ clinic, Deputy Garibay left Plaintiff alone for eight hours in his wheelchair, bleeding.  (Id. at ¶ 45.)  Thereafter, instead of taking Plaintiff to a hospital, Sergeant Gasataya assigned him to a top bunk in a cell with no functioning toilet and water containing feces on the floor.  (Id. at ¶ 46.)  Plaintiff had difficulty seeing due to his bruised face and eyes, could not effectively ambulate because of damage to his ribs, hip, and shoulder, and was unable to eat because of damage to his jaw and his broken teeth.  (Id.)  Nevertheless, for over a week, Defendants Upchurch, Haas, and Borja regularly refused to take him to the clinic or request medical assistance.  (Id.)  On July 16 and 18, 2015, Plaintiff collapsed in his cell.  (Id. at ¶¶ 48–49.)  Although Plaintiff could not ambulate without falling down, Nurse Moscoso took away Plaintiff's wheelchair.  (Id. at

_____

[13] "This differs from the inquiry under the Eighth Amendment which requires that the prison official must *subjectively* have a sufficiently culpable state of mind."  Gordon, 888 F.3d at 1125 n.4 (citation omitted).

¶ 49.)  On July 18 and 20, Plaintiff presented to the clinic with two black eyes, bloody nose, cold sweats, blurry vision, vomiting, difficulty ambulating, and chronic fainting episodes.  (Id. at ¶¶ 49–50.)  Doctor Zolnouni refused to examine Plaintiff, stating that he was "okay" and did not "have a problem."  (Id. at ¶ 50.)  On July 24, Plaintiff passed out and was taken to the hospital.  (Id. at ¶ 51.)  On August 11, Nurse Luna refused Plaintiff's request to see his orthopedic surgeon, although he had an appointment.  (Id. at ¶ 53.)  The superior court judge learned from MCJ that Plaintiff needed a wheelchair to ambulate for at least the next 30 days.  (CT 6.)  In late August, Plaintiff informed the superior court judge that he was still suffering from "multiple fractures," and after fainting during a court hearing, Plaintiff was taken to the hospital by paramedics where doctors informed Plaintiff that he had "serious injuries and multiple fractures in [his] face."  (4AC at ¶ 54; CT 6; RT 304–05.)

Despite fainting spells and chronic pain from serious injuries, multiple facial fractures, and broken teeth, over the next several months, Defendants routinely denied him medical care.  (4AC at ¶¶ 54–59.)  On October 1 and 7, Dr. Felahy discontinued Plaintiff's pain medication and denied him treatment.[14]  (Id. at ¶ 56.)  In January 2016, Dr. Pryor discounted Plaintiff's injuries as "old and healed."  (Id. at ¶ 59.)  Dr. Teophilov left him handcuffed to a gurney in the Twin Towers clinic for a week.  (Id.).  In April and June 2016, Nurse Tutt refused to give Plaintiff his medications or let him see a doctor.  (Id. at ¶¶ 62, 64.)  Under these circumstances, a jury could reasonably determine that Defendants Vivo, Pryor, Garibay, Gasataya, Upchurch, Haas, Borja, Moscoso, Zolnouni, Luna, Felahy, Teophilov, and Tutt (the "Medical Care Defendants") knew that Plaintiff suffered serious injuries, including chronic pain, from the assault and yet recklessly refused or delayed giving him

---

[14] On December 1, Dr. Gevorkian restarted Plaintiff on multiple medications. (4AC at ¶ 58.)

treatment that a reasonable prison official would realize carries a high risk of exacerbating Plaintiff's pain and injuries.

Medical Care Defendants argue that Dr. Teophilov's testimony defeats Plaintiff's claims because he "opined that the care provided to Plaintiff was appropriate and that it caused him no injury." (Motion at 19; see SUF Nos. 104–106.)  They assert that Dr. Teophilov's "undisputed evidence is that Plaintiff received *daily* medical care in July and August of 2015, and frequent medical care thereafter."  (Id. at 20 [citing SUF Nos. 11–71].)  But even if the medical documents were properly authenticated and Dr. Teophilov was properly disclosed as an opinion witness, his statements are not dispositive—they do not negate the material facts asserted by Plaintiff in his verified 4AC.  Plaintiff's sworn statements concerning the medical care he received create genuine issues of material facts and defeat summary judgment.  For examples, Dr. Teophilov's opinion does not contend that it was medically appropriate for (1) PA Vivo releasing Plaintiff from Twin Towers urgent care despite Plaintiff losing consciousness and fainting from severe pain and rectal bleeding, (2) Dr. Zolnouni refusing to examine Plaintiff on July 20 despite Plaintiff presenting with a swollen face and black eyes and reporting chronic fainting episodes, (3) Nurse Moscoso taking away Plaintiff's wheelchair despite his difficulty ambulating after the assault, (4) Nurse Luna refusing to allow Plaintiff to see his orthopedic physician despite having an appointment, (5) Dr. Felahy discontinuing Plaintiff's pain medications and denying him care, (6) Dr. Pryor discounting Plaintiff's injuries as merely "old and healed," or (7) Nurse Tutt refusing to provide Plaintiff with his pain medications or let him see a doctor.[15]  Dr. Teophilov's opinion does not refute Plaintiff's assertion that in January 2016, Dr. Teophilov allowed Plaintiff to be left handcuffed to a gurney at the Twin Towers Clinic for a week.  (4AC at ¶ 59.)

---

[15] Defendants did not include a declaration from any of these doctors or nurses.

1    Medical Care Defendants also contend that Plaintiff cannot "demonstrate that

2  any Defendant obstructed or denied [him] medical care." (Motion at 20). To the

3  contrary, Plaintiff has provided material evidence, i.e., his sworn statements, that

4  Defendants Garibay, Gasataya, Upchurch, Haas, and Borja obstructed Plaintiff's

5  access to medical care despite signs that Plaintiff was suffering from pain and

6  injuries from the assault that a reasonable official would consider a serious risk to

7  Plaintiff's health. Deputy Garibay professes no recollection of the incidents

8  described in the 4AC, even after reviewing the incident report. (Dkt. 321-11.) In

9  Sergeant Gasataya's declaration (Dkt. 321-7), he does not refute Plaintiff's

10  assertion that instead of taking Plaintiff to the hospital after the assault, Gasataya

11  "hid" Plaintiff in a cell with no functioning toilet and water containing feces on the

12  floor and assigned him to a top bunk despite Plaintiff being in a wheelchair. (4AC

13  at ¶ 46.) While Deputy Upchurch asserts that he "never observed or heard Deputy

14  Borjas or CA Haas refusing [Plaintiff] a medical appointment or deny him medical

15  care" (Dkt. 321-5 at ¶ 5), Upchurch has no recollection of his own actions but

16  merely reiterates what the standard policies are (id. ¶¶ 3, 4, 6). Similarly, CA Haas

17  states that he "never observed or heard a deputy refusing [Plaintiff] a medical

18  appointment or deny[ing] him medical care," but merely speculates about his own

19  actions during the times in questions.[16]  (Dkt. 321-3 at ¶¶ 3–5.)

20    In sum, viewing the evidence in the light most favorable to Plaintiff, there are

21  triable issues of fact on the objective deliberate indifference claim. Applying the

22  <u>Gordon</u> framework, a jury could conclude that a reasonable jail official who was

23  informed that Plaintiff continued to suffer serious symptoms, including fainting,

24  vomiting, difficulty ambulating, and chronic pain, would have understood that he

25  faced a "substantial risk of suffering serious harm," 888 F.3d at 1125, and needed

26  prompt medical care.

27

28    [16] Deputy Borja did not submit a declaration.

28

**C.    Retaliation.**

In addition to his Fourteenth Amendment claims, Plaintiff alleges that some Defendants retaliated against him for filing grievances. (4AC at ¶¶ 68, 70.) With respect to pretrial detainees, "a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote omitted); accord Nyland v. Calaveras Cty. Sheriff's Jail, 688 F. App'x 483, 485 (9th Cir. 2017) (applying the Rhodes elements to a pretrial detainee).

Construing the facts in the light most favorable to Plaintiff, the nonmoving party, there are genuine issues of material fact as to some Defendants' liability on the retaliation claim. Plaintiff attests in his verified 4AC that in retaliation for filing multiple grievances concerning the assault and lack of medical care, some Defendants seized his personal property including legal documents, denied him access to exercise and phone calls, placed him in solitary confinement, and prevented him from exhausting his grievances. (4AC at ¶¶ 68, 70.) Specifically, on September 22, 2015, Lieutenant Mosquera refused Plaintiff's request to see a doctor and instead transferred him to solitary confinement. (4AC at ¶ 55.) On December 9, Dr. Felahy discontinued Plaintiff's religious diet. (Id. at ¶ 58.) Deputy Abril denied him access to religious services, roof time, and daily hygiene. (Id. at ¶¶ 56–59.) Abril and Mosquera removed Plaintiff's wheelchair without medical authorization. (Id. at ¶ 58.) Deputies Rodriquez and Tremble hit and punched Plaintiff in the face, chest, and stomach after Plaintiff complained of being too weak to walk and then falsely accused Plaintiff of assaulting them. (Id. at ¶ 63.) They also took away his phone privileges and destroyed his personal property. (Id.) Deputy Rodriguez denied shower access to Plaintiff for two months. (Id.) Deputy

1    Tremble threatened Plaintiff that he would "die in his cell." (Id.)  In May 2016,

2    Sergeant Toms refused to take Plaintiff to the medical clinic unless he signed a

3    blank form.  (Id. at ¶ 64.)  In August, Sergeant Garcia refused to take Plaintiff to his

4    physical therapy treatment and then Nurse Menefee filed a complaint against

5    Plaintiff, falsely claiming that he was refusing physical therapy treatment.  (Id. at

6    ¶ 65.)  In multiple letters and phone calls, Sheriff McDonnell was informed of

7    Plaintiff's assault and the subsequent mistreatment by jail staff but did not

8    intervene.  (Id. at ¶ 66; see also Dkt. 166-7 at 56–66 [correspondence regarding

9    Plaintiff with the Office of the Sheriff].)

10          Under these circumstances, a jury could reasonably find that Defendants

11   Mosquera, Felahy, Abril, Rodriguez, Tremble, Toms, Garcia, Menefee, and

12   McDonnell (the "Retaliation Defendants") took adverse actions against Plaintiff

13   because he was complaining about the assault and the subsequent medical care and

14   that such adverse actions did not further any legitimate penological goals.  None of

15   the declarations filed by Retaliation Defendants specifically refutes Plaintiff's

16   assertions or argues that their actions served a legitimate penological goal.[17]  (Dkt.

17   321-6, 321-9, 321-10, 321-12.)  Instead, Retaliation Defendants contend that "the

18   fact that Plaintiff filed more than 176 grievances conclusively belies Plaintiff's

19   allegation that he was not permitted to file grievances."  (Motion at 21.)  However,

20   as a matter of law, "[s]peech can be chilled even when not completely silenced."

21   Rhodes, 408 F.3d at 568.  Indeed, the Ninth Circuit has "*never* required a litigant,

22   *per impossibile,* to demonstrate a *total* chilling of his First Amendment rights to file

23   grievances and to pursue civil rights litigation in order to perfect a retaliation

24   claim."  Id.  Instead, "the proper [First Amendment] inquiry asks whether an

25   official's acts would chill *or* silence a person of ordinary firmness from future First

26   Amendment activities."  Mendocino Envtl. Ctr. v. Mendocino Cty., 192 F.3d 1283,

_____

27          [17] Defendants Felahy, Abril, Rodriguez, Tremble, and Toms did not submit

28   any declarations.

1300 (9th Cir. 1999) (citation omitted) (emphasis added).  Further, given the lengthy pattern of retaliation asserted by Plaintiff and the PLRA requirement to exhaust administrative remedies before the filing of prisoner civil rights litigation, the number of grievances filed by Plaintiff is not dispositive of his First Amendment claim.  See Rhodes, 408 F.3d at 569 ("Rejecting Rhodes's suit on the basis of his having filed administrative grievances seeking to vindicate his rights thus would establish a rule dictating that, by virtue of an inmate's having fulfilled the requirements necessary to pursue his cause of action in federal court, he would be precluded from prosecuting the very claim he was forced to exhaust.").  A jury could reasonably find that Retaliation Defendants' actions, as asserted by Plaintiff, would chill or silence an inmate of ordinary firmness from future First Amendment activities.

Retaliation Defendants argue that "Plaintiff's claims against Sheriff McDonnell individually fail because there is no evidence that Sheriff McDonnell knew anything at all about Plaintiff."  (Motion at 22.)  "A supervisor is liable under § 1983 for a subordinate's constitutional violations if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  Maxwell v. Cty. of San Diego, 708 F.3d 1075, 1086 (9th Cir. 2013) (citation omitted).  Sheriff McDonnell asserts that he "had no direct knowledge of [Plaintiff's] complaints or alleged mistreatment."  (Dkt. 321-10 at ¶ 4.)  But Plaintiff has provided circumstantial evidence that Sheriff McDonnell was under constructive notice of the alleged mistreatment from Plaintiff himself, from Plaintiff's family, and from the superior court judge handling Plaintiff's criminal trial.  (4AC at ¶ 66 & Ex. AA [Dkt. 166-7 at 56, 57, 66].)  Thus, there is a genuine issue of material fact whether Sheriff McDonnell is liable for his subordinates' violations of Plaintiff's First Amendment rights.

**D.    Qualified Immunity.**

Defendants argue that even if they committed a constitutional violation, they are entitled to qualified immunity.  (Motion at 3, 16–18, 20–21.)  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  "In determining whether a state official is entitled to qualified immunity in the context of summary judgment, we consider (1) whether the evidence viewed in the light most favorable to the plaintiff is sufficient to show a violation of a constitutional right and (2) whether that right was clearly established at the time of the violation."  Sandoval, 2021 WL 116539, at *10, 2021 U.S. App. LEXIS 866, at *28 (citing Pearson, 555 U.S. at 232); see Horton, 915 F.3d at 599 ("Qualified immunity protects government officials from liability for civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  A "right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Castro, 833 F.3d at 1067 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

While the legal framework governing Plaintiff's Fourteenth Amendment claims shifted during the pendency of his case—from subjective deliberate indifference to objective reasonableness—it has no bearing on the qualified immunity analysis.  Instead, under Horton, the court applies "the current objective deliberate indifference standard to analyze whether there was a constitutional violation," and "concentrate[s] on the objective aspects of the [prior] constitutional standard to evaluate whether the law was clearly established."  Sandoval, 2021 WL 116539, at *10, 2021 U.S. App. LEXIS 866, at *29 (citing Horton, 915 F.3d at 600,

602).  "Because the premise of qualified immunity is that state officials should not
be held liable for money damages absent fair warning that their actions were
unconstitutional, the clearly established … inquiry is an objective one that
compares the factual circumstances faced by the defendant to the factual
circumstances of prior cases to determine whether the decisions in the earlier cases
would have made clear to the defendant that his conduct violated the law."  Id. at
*12, 2021 U.S. App. LEXIS 866, at *35 (citing D.C. v. Wesby, 138 S. Ct. 577, 590
(2018)).  "Consistent with this purpose, the qualified immunity analysis remains
objective even when the constitutional claim at issue involves subjective elements."
Id. at *13, 2021 U.S. App. LEXIS 866, at *36 (citing Crawford-El v. Britton, 523
U.S. 574, 588–89 (1998)).

**1.    Failure-to-Protect.**

At the time Plaintiff was attacked at MCJ, "the law regarding prison
officials' duty to take reasonable measures to protect inmates from violence at the
hands of other prisoners was 'clearly established.'" Robinson v. Prunty, 249 F.3d
862, 866 (9th Cir. 2001) (denying qualified immunity); see Farmer v. Brennan, 511
U.S. 825, 833 (1994) ("as the lower courts have uniformly held, and as we have
assumed, prison officials have a duty to protect prisoners from violence at the hands
of other prisoners") (citation omitted); Clem v. Lomeli, 566 F.3d 1177, 1182 (9th
Cir. 2009) ("direct causation by affirmative action is not necessary: 'a prison
official may be held liable under the Eighth Amendment if he knows that inmates
face a substantial risk of serious harm and disregards that risk *by failing to take
reasonable measures to abate it*.'") (quoting Farmer, 511 U.S. at 847).  Indeed, the
contours of Plaintiff's "right to be free from violence at the hands of other
inmates … required only that the individual defendants take reasonable measures to
mitigate the substantial risk to [Plaintiff]."  Castro, 833 F.3d at 1067 (denying
qualified immunity).

Failure-to-Protect Defendants contend that "no existing precedent holds that officers commit a constitutional violation in failing to head off an assault *that they were not aware of until after the fact*, much less that a deputy who is on a light duty assignment and not *allowed* to have contact with inmates (Deputy Enriquez) must directly intervene in an ongoing assault." (Motion at 17–18). However, viewing the facts in the light most favorable to Plaintiff, as the court is required to do, a jury could find that Failure-to-Protect Defendants were aware of the assault and failed to take reasonable steps to abate it, either by directly intervening or promptly summoning assistance. See Uriarte v. Schwarzenegger, No. 06CV1558, 2011 WL 4945232, at *3, 2011 U.S. Dist. LEXIS 120346, at *9 (S.D. Cal. Oct. 18, 2011) ("A defendant may be held liable for failing to intervene when he had enough time to observe what was happening and to intervene in the conduct but failed to do so."); Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002) ("a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so"); Murphy v. Turpin, 159 F. App'x 945, 948 (11th Cir. 2005) ("[Correctional officer's] s alleged failure to intervene, standing by in the face of an inmate disturbance that he observed, particularly one which [the inmate] alleges resulted in his loss of oxygen and necessitated CPR treatment, *may* constitute deliberate indifference to a substantial risk of serious harm."); Prater v. Dahm, 89 F.3d 538, 541 (8th Cir. 1996) (duty to protect inmates from attacks requires that prison officials take reasonable measures to abate substantial risks of serious harm of which they are aware).

## 2.    Objective Deliberate Indifference.

Regarding Plaintiff's medical-care claim, Medical Care Defendants argue that "even assuming there *was* a triable fact issue as to the constitutionality of their conduct, [they] would be entitled to qualified immunity because any rights violation was not clearly established in 2015–2016, the time period at issue." (Motion at 20.)

To the contrary, applicable cases "make clear that prison officials violate the Constitution when they 'deny, delay or intentionally interfere' with needed medical treatment." Sandoval, 2021 WL 116539, at *17, 2021 U.S. App. U.S. Dist. LEXIS, at *47 (quoting Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)). Indeed, the contours of Plaintiff's right to adequate medical care are "clear: a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." Id., 2021 U.S. App. U.S. Dist. LEXIS, at *48. Nevertheless, Medical Care Defendants contend "[n]o case holds that deputies must force a detainee to go to medical appointments, eat, or take medications when he refuses, or that it is unconstitutional to move a detainee from a medical floor to a lower level of care when the patient is no longer deemed to need such care." (Motion at 20–21). However, viewing the facts in the light most favorable to Plaintiff, as the court is required to do, a jury could find that Medical Care Defendants knew that Plaintiff suffered serious injuries, including chronic pain, from the assault and yet recklessly refused or delayed giving him treatment that a reasonable prison official would realize carries a high risk of exacerbating Plaintiff's pain and injuries. At the time of Plaintiff's assault and subsequent injuries, it was clearly established that significant delays in treatment amount to deliberate indifference. See, e.g., Reed v. Barcklay, 634 F. App'x 184, 186 (9th Cir. 2015) ("It was clearly established that a physician's failure to provide treatment that would alleviate an inmate's significant pain could constitute deliberate indifference in violation of the Eighth Amendment.") (citing Jett, 439 F.3d at 1096); McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) ("the fact that an individual sat idly by as another human being was seriously injured despite the defendant's ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the prisoner's suffering"), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997); Hunt v. Dental Dep't,

35

865 F.2d 198, 201 (9th Cir. 1989) (three-month delay of treatment was deliberately indifferent where prisoner had serious problems and complained repeatedly); see also Kelley v. Borg, 60 F.3d 664, 667 (9th Cir. 1995) (rejecting notion that clearly established right to adequate medical care needs to be more narrowly defined than "deliberately indifferent to serious medical needs"); accord South v. Gomez, 211 F.3d 1275 (9th Cir. 2000) ("Our precedents make clear that with respect to prisoner medical claims, the right at issue should be defined as a prisoner's Eighth Amendment right to officials who are not 'deliberately indifferent to serious medical needs.' We have repeatedly rejected attempts by defendants to define the right allegedly violated with greater specificity.") (citations omitted).[18]

## E.   Claims Against Defendants Bandino, Salinas, Morales, Sanford, Little, Silvanskaya, and Anderson.

Defendants contend that there are "several named Defendants in the 4AC who are identified as Defendants, but there are no factual allegations as to how they violated Plaintiff's [constitutional] rights." (Motion at 23.) The Court agrees. While Plaintiff named Lieutenant Bandino, Lieutenant Salinas, Sergeant Morales, Deputy Sanford, Dr. Little, Dr. Silvanskaya, and Nurse Anderson as Defendants (4AC at ¶¶ 5, 7, 10, 20, 26, 28, 31), the 4AC includes *no* factual allegations that any of these Defendants violated Plaintiff's constitutional rights. Indeed, for many of

---

[18] Retaliation Defendants do not contend that they are entitled to qualified immunity on Plaintiff's retaliation claim. (See generally Motion at 21–23.) Nevertheless, the Court notes that "the prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes," regardless whether Defendants' actions *actually chilled* the exercise of Plaintiff's First Amendment rights. Rhodes, 408 F.3d at 569–70 ("We think our case law is abundantly clear that the infliction of harms other than a total chilling effect can establish liability for such conduct, and there can be no serious doubt that the harms allegedly visited upon Rhodes in response to his exercise of First Amendment rights went well beyond any marginal chilling of his rights.").

these Defendants, they are not referenced at all in Plaintiff's lengthy description of the facts underlying his claims.  (4AC at ¶¶ 40–66).

Plaintiff had multiple opportunities over a *three-year* period to refine the allegations in his complaint.  In dismissing his First Amended Complaint with leave to amend, the Court admonished Plaintiff that his complaint violates Rule 8 because the "allegations against many of the defendants are so general that they do not fairly apprise defendants of who allegedly participated in what kind(s) of wrongdoing and when." (Dkt. 12 at 5–6 [citing Fed. R. Civ. P. 8(a)(2)].)  Moreover, the Court ordered Defendants' counsel to assist Plaintiff in identifying many of the Defendants.  (Dkt. 90, 108.)  And prior to filing his 4AC, the Court granted Plaintiff's request to issue certain subpoenas to the Los Angeles Sheriff's Department, including a request for shift records.  (Dkt. 126, 132, 137.)  Finally, Plaintiff "kept a detailed daily [journal] of all of the events that occurred in [his] complaint which contains events by these Defendants who did violate [his constitutional] rights."  (4AC at ¶ 66 & Ex. BB.)  Thus, Plaintiff has had sufficient time and information to specify the factual allegations against each of the named Defendants.  Because the 4AC fails to do so, the claims against Defendants Bandino, Salinas, Morales, Sanford, Little, Silvanskaya, and Anderson are dismissed with prejudice.

## VII.

## RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Report and Recommendation; (2) denying Plaintiff's request for extension of time (Dkt. 337); (3) denying without prejudice Plaintiff's motion to serve subpoenas on LASD (Dkt. 306); (4) dismissing the claims against Defendants Bandino, Salinas, Morales, Sanford, Little, Silvanskaya,

1   and Anderson with prejudice; and (5) in all other respects denying the Motion for

2   Summary Judgment (Dkt. 321).

3

4   DATED:  February 10, 2021

5   KAREN E. SCOTT
    United States Magistrate Judge

6

7   ## NOTICE

8           Reports and Recommendations are not appealable to the Court of Appeals

9   but are subject to the right of any party to timely file objections as provided in the

10  Federal Rules of Civil Procedure and the instructions attached to this Report.  This

11  Report and any objections will be reviewed by the District Judge whose initials

12  appear in the case docket number.